[Cite as *State v. Urbina*, 2016-Ohio-7009.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-978 |
| | | (M.C. No. 2015 TRC 113155) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Walter O. Figueroa Urbina, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 27, 2016

**On brief:** *Richard C. Pfeiffer, Jr.,* City Attorney, *Laura N. Baker*, *Melanie R. Tobias*, and *Orly Ahroni*, for appellee. **Argued:** *Orly Ahroni.*

**On brief:** *Yeura R. Venters*, Public Defender, and *John W. Keeling*, for appellant. **Argued:** *John W. Keeling.*

APPEAL from the Franklin County Municipal Court

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Walter O. Figueroa Urbina, appeals from a judgment entry of the Franklin County Municipal Court finding him guilty of operating a vehicle while under the influence of alcohol ("OVI") and driving under an OVI suspension. For the following reasons, we affirm in part and reverse in part.

## I. Facts and Procedural History

{¶ 2} On February 21, 2015, Urbina received a citation and summons for one count of OVI, in violation of R.C. 4511.19(A)(1)(a); one count of OVI per se, in violation of R.C. 4511.19(A)(1)(d); and one count of driving under OVI suspension, in violation of R.C. 4510.14. Urbina appeared with counsel and entered a plea of not guilty, and the trial court ordered the appointment of an interpreter for Urbina, who does not speak English.

{¶ 3}   At a jury trial commencing August 11, 2015, Ishmael Dabo, a trooper with the Ohio State Highway Patrol, testified that he encountered Urbina during the early morning hours of February 21, 2015 as Urbina sat inside a two-door Honda Civic that had slid off the roadway and down an embankment during a snowstorm.  The vehicle's engine was running, the lights were turned on, and Urbina was seated in the driver's seat with another occupant seated in the front passenger's seat.  Trooper Dabo testified he could see tire skid marks in the snow, and he estimated, over defense counsel's objection, that the vehicle had skidded off the road "less than ten minutes before [he] got there."  (Tr. at 53.)

{¶ 4}   Trooper Dabo testified that when he knocked on the vehicle's window, Urbina rolled the window down and Trooper Dabo tried to ask him what was going on and how the vehicle had ended up off the roadway, but Trooper Dabo had "difficulty communicating" with Urbina because he was speaking Spanish and did not speak English "at all." (Tr. at 54.)  Trooper Dabo stated Urbina was using hand gestures to communicate and, through those hand gestures, Urbina indicated that he was driving and came down the embankment.  Urbina did not provide a driver's license to Trooper Dabo.

{¶ 5}   Trooper Dabo stated he observed a strong odor of alcohol and that Urbina had bloodshot, glassy eyes and exhibited slurred speech.  He ordered Urbina out of the vehicle, and a paramedic with the Columbus Division of Fire who had arrived on the scene and "could understand a little bit of Spanish" helped Trooper Dabo communicate with Urbina.  (Tr. at 61.)  Trooper Dabo performed two field sobriety tests, the horizontal gaze nystagmus ("HGN") test and the vertical gaze nystagmus ("VGN") test, both of which yielded signs that Urbina was impaired.  Trooper Dabo stated he did not perform additional field sobriety tests because "it was snowing and weather conditions wouldn't permit it." (Tr. at 67.)  Based on all of his observations of Urbina, including that Urbina had difficulty standing, the strong odor of alcohol, the glassy and bloodshot eyes, and Urbina's performance on the HGN and VGN tests, Trooper Dabo placed Urbina under arrest.

{¶ 6}   Once Trooper Dabo had placed Urbina under arrest, he ran a records check and ascertained that Urbina's driving privileges were under suspension for a prior OVI conviction.   After providing Urbina with a copy of the Bureau of Motor Vehicles consequences of test refusal form, which the other occupant of the vehicle read to Urbina

in Spanish, Trooper Dabo stated Urbina agreed to submit to a chemical breath test. Trooper Dabo administered the chemical breath test on a BAC DataMaster, and the test result showed a breath alcohol concentration of .206 grams per 210 liters of breath, above the legal limit of .08. Trooper Dabo stated that during his entire interaction with Urbina, Urbina never communicated to him that he was not driving the vehicle.

{¶ 7}   The state played for the jury the video recording of Trooper Dabo's cruiser dash camera showing Trooper Dabo's interaction with Urbina. In the video, Trooper Dabo is heard asking Urbina if he speaks any English, and then Trooper Dabo states "[y]ou're going to learn how to speak some English today." (Tr. at 114; State's Ex. 3 at 03:46.) Trooper Dabo stated Urbina appeared to understand some English based on some of his responses to Trooper Dabo's questions. The video also recorded Urbina's communications with the trooper. At one point, Urbina speaks to the trooper. Defense counsel contends the video recording shows Urbina saying "Yo no iba manejando," which translates to "I wasn't driving." (Tr. at 161; State's Ex. 3 at 04:03.) The state characterizes the video as depicting Urbina as saying "Yo iba manejando," which translates to "I was driving." However, due to the quality of the video recording, we cannot discern with any accuracy what Urbina was saying.

{¶ 8}   On cross-examination, Trooper Dabo agreed he was not there to witness the vehicle getting stuck in the embankment. He testified that by the time he arrived on the scene, the vehicle was immovable and needed to be towed. Additionally, Trooper Dabo stated he did not know the other occupant of the vehicle's name and he did not perform any field sobriety tests on the other occupant, although the other occupant also had an odor of alcohol about him. Trooper Dabo stated it was his belief the other occupant of the vehicle was in the vehicle at the time it slid down the embankment because Trooper Dabo did not see any footprints in the snow leading up to the vehicle. He agreed that he did not mention anything about looking for footprints or observing footprints when he wrote the report of the incident. Trooper Dabo also agreed he did not include anything in his report about his opinion as to how long he thought the vehicle had been in that position based on the tire tracks in the snow.

{¶ 9}   Defense counsel attempted to ask Trooper Dabo about his administration of the field sobriety tests, but the trial court sustained the state's objection that defense

counsel could not ask questions regarding the validity of the tests because Urbina did not file a timely motion to suppress in this case.

{¶ 10} Aaron Shonkwiler, a lieutenant paramedic for the Columbus Division of Fire, testified he arrived at the scene of the accident with Trooper Dabo and attempted to communicate with Urbina in English but "it was pretty clear that he was confused on some of the things that [Lieutenant Shonkwiler] was saying," so he instead started asking "some very simple questions in Spanish." (Tr. at 155.) Lieutenant Shonkwiler said he asked Urbina some questions to determine whether he was injured, but he did not ask Urbina whether he had been driving the vehicle. Later on in the interaction, Lieutenant Shonkwiler stated Urbina made an "[u]p and down in a semi-circular fashion" motion with his hands that Lieutenant Shonkwiler stated he understood to mean Urbina was indicating he had been driving the vehicle. (Tr. at 156.) He testified, though, that the gesture was not made in response to a question from him about whether Urbina had been driving. Further, Lieutenant Shonkwiler stated he looked for things like footprints in the snow or blood in the vehicle but that he "found no other indication that anyone else may have been present, other than [Urbina] and the other gentleman in the vehicle." (Tr. at 158.)

{¶ 11} Lieutenant Shonkwiler testified that his Spanish "is not perfect" and that he was having trouble understanding Urbina's responses when spoken in Spanish. (Tr. at 159.) Lieutenant Shonkwiler attempted to ask Urbina where he had been going that night, but he could not understand Urbina's response. Lieutenant Shonkwiler then said "[t]rabajo, work," and Urbina replied "[s]i." (Tr. at 159.)

{¶ 12} After the state rested its case, Urbina called Tamara Moreno as a witness. Prior to Moreno's testimony, the trial court granted the state's motion in limine with regard to Moreno mentioning anything specific about her suffering a miscarriage the night of the accident or that she was currently undergoing treatment for cancer. Specifically, the trial court ruled Moreno was to make no mention of "pregnancies, cancers[,] bleeding, nausea, vomiting or any of that." (Tr. at 179.) The trial court instructed Moreno that her testimony was to be limited to "I left to go get help; and while gone, I didn't return because I had a medical condition, and I sought medical treatment." (Tr. at 180.)

{¶ 13} Moreno testified that Urbina is the father of two of her children and that she has known Urbina for 16 or 17 years. She stated Urbina does not speak English and does "not really" understand English. (Tr. at 188.) Moreno testified she was with Urbina on the night of February 21, 2015, and that she was the one driving the vehicle when it skidded off the road. She testified that Urbina called her that night asking for a ride home from his boss's house. Moreno said she told Urbina she would ask her neighbor to drive them because she "didn't feel good" because she "had a medical problem." (Tr. at 189, 190.) Her friend, identified as Maria, agreed to give her a ride to pick up Urbina at the La Vista apartment complex off Shrock Road. Moreno testified Maria drives an Astro van with three rows of seats, and two of Moreno's children and three of Maria's children rode in the van with them to pick up Urbina.

{¶ 14} When they arrived at the La Vista apartments, Moreno testified Urbina and his friend both met them and needed rides. Because there was not enough room in the van for all of them, and because they needed to move the Civic from the apartment complex, Moreno got out of the van and drove the Civic with Urbina in the passenger seat and Urbina's friend in the back seat. As she was driving, Moreno stated she "hit a slick spot," and the vehicle slid off the road and went down the embankment, where it got stuck in a snowbank. (Tr. at 197.) Moreno stated she hit her head and her stomach in the accident. Maria stopped the van and "rushed down to help [Moreno] out of the car." (Tr. at 198.) Moreno stated they tried to get the vehicle out of the snow, but it was stuck. Moreno testified that the group decided that she should return home and get her Dodge Durango, a four-wheel drive vehicle, to tow the Civic out of the snow and back onto the road. At that point, Moreno stated she left Urbina and his friend sitting in the Civic while she drove with Maria in the van to go get the four-wheel drive vehicle. However, Moreno stated she did not make it back to the scene of the accident that night because "a medical issue happened where they had to rush [her] to the hospital." (Tr. at 199.)

{¶ 15} Moreno testified she never talked to Trooper Dabo in relation to this case. She stated she called the highway patrol and tried to explain that she had been the driver of the Civic, "but they told [her] that [she] would have to go to court." (Tr. at 199.)

{¶ 16} On cross-examination, Moreno stated Urbina did not say he needed a ride that night because he had been drinking, and she further testified Urbina has asked her

for rides on various occasions because she drives and Urbina does not. Moreno agreed that Urbina owned the Civic. When asked whether Maria was in court that day, Moreno replied, "[n]o, she got deported." (Tr. at 208.) Moreno also agreed that on February 21, 2015, she did not have a valid driver's license. When asked if it was her "choice" not to take the Durango initially, Moreno said it was "[b]ecause of medical." (Tr. at 213.)

{¶ 17} Following deliberations, the jury returned guilty verdicts to the OVI charge, the OVI per se charge, and the operating a vehicle while under an OVI suspension charge. The trial court sentenced Urbina to 180 days in jail with 120 days suspended and 2 years of community control; an 18-month class five driving rights suspension with a $500 fine; and a 180-day suspended jail term with an additional $500 fine on the operating a vehicle while under suspension conviction. Urbina timely appeals.

## II. Assignments of Error

{¶ 18} Urbina assigns the following errors for our review:

[1.] The trial court and the state improperly prevented the defense witness from testifying about relevant and probative facts when she was admonished that she could not testify about the details of her medical issues that prevented her from returning to the scene.

[2.] The trial court and the state improperly prevented the defendant from placing his witness in a proper setting for the jurors to properly assess her credibility when they prevented the jurors from hearing that the defense witness was suffering from and being treated for throat cancer.

[3.] The trial court and the state violated the defendant's right to present a defense when they unfairly intimidated the defense witness with threats of perjury and threats of prosecution on other charges right before she testified and the trial court further erred when it stated, in front of the jurors, that the defense witness was very nervous and then admonished the witness to tell the truth and not to make stuff up before she even had an opportunity to testify about any material facts.

[4.] The trial court, over objection, improperly allowed the state to impeach the defense witness with inadmissible other act evidence in an attempt to improperly portray the defense witness as a scofflaw or bad person and the prosecutor

> improperly impeached the witness by accusing her of making inconsistent out-of-court statements to the prosecutor when there as no evidence of such inconsistent statements presented to the jurors.
>
> [5.] The trial court erred when it sustained the state's objection to any cross-examination by the defendant on the manner or the validity of the way the trooper administered the horizontal gaze nystagmus test.
>
> [6.] The trial court erred when it allowed the trooper to testify as an expert witness, over objection, that the tire tracks had been left in the snow less than ten minutes before the trooper had arrived at the scene without first establishing that the trooper had the requisite knowledge and training to render such an opinion.

## III. First Assignment of Error – Medical Condition Testimony

{¶ 19} In his first assignment of error, Urbina argues the trial court erred when it admonished Moreno she could not testify about any of the details of the medical condition she suffered the night of the accident. Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 33, citing *State v. Bartolomeo*, 10th Dist. No. 08AP-969, 2009-Ohio-3086, ¶ 24. An abuse of discretion connotes a decision that was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 20} At trial, the state argued as part of a motion in limine that Moreno should not be allowed to testify regarding any specific details of the medical condition she suffered shortly after the accident. Specifically, Moreno had been pregnant. The state and defense counsel represented to the trial court that Moreno's testimony would be that she left the scene of the accident to go get her Durango to tow the Civic out of the embankment but when she left the scene, she began having a miscarriage and went immediately to the hospital to seek medical attention. Because she suffered a miscarriage that night and needed medical attention, Moreno would have testified she was unable to return to the scene of the accident in a timely fashion. The state argued this testimony, though relevant, would have been unfairly prejudicial. The trial court granted the state's

motion and admonished Moreno before her testimony that she was not to mention "pregnancies, cancers[,] bleeding, nausea, vomiting or any of that." (Tr. at 179.) Further, the trial court specifically instructed Moreno that her testimony was to be limited to "I left to go get help; and while gone, I didn't return because I had a medical condition, and I sought medical treatment." (Tr. at 180.) Urbina now argues the trial court abused its discretion in excluding this testimony.

{¶ 21} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." There is no dispute here that Moreno's proposed testimony regarding her pregnancy and injuries leading to a miscarriage constitute relevant evidence, offering an explanation as to why Moreno did not return to the scene as she had planned. However, Urbina argues the trial court abused its discretion when it ruled that Moreno could not testify regarding her miscarriage. Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 22} " 'If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word "unfair." ' " *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001). Thus, " '[u]nfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.' " *Id.*, quoting *Oberlin* at 172. Evidence may be unfairly prejudicial if it " 'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish.' " *Id.*, quoting *Oberlin* at 172. Often, though not always, evidence is unfairly prejudicial if it appeals to the jury's emotions rather than the jury's intellect. *Id.*

{¶ 23} Fairness is subjective and thus the determination whether evidence is unfairly prejudicial is left to the sound discretion of the trial court. *Crotts* at ¶ 25, citing *State v. Robb*, 88 Ohio St.3d 59, 69 (2000). The state argues the trial court appropriately limited Moreno's testimony regarding her miscarriage because that testimony could have aroused the juror's sympathy for Moreno and then shifted that sympathy to Urbina. Here, however, we agree with Urbina that the trial court abused its discretion in

determining the danger of unfair prejudice from Moreno's proposed testimony regarding having suffered a miscarriage shortly after the accident would outweigh the relevant and highly probative nature of the evidence.

{¶ 24} Urbina's entire defense was that he was not driving the vehicle at the time of the accident, and Moreno was Urbina's only witness. Thus, Urbina's ability to present a defense depended on Moreno's ability to testify as to her account of what happened on February 21, 2015. Due to the trial court's ruling that Moreno was not to mention her pregnancy in any way, Moreno's testimony was limited and somewhat disjointed. Further, the details of her story about why she did not return to the scene of the accident as planned would have helped the jury assess her credibility. As the United States Supreme Court has noted, presenting evidence "tells a colorful story with descriptive richness" and "as its pieces come together a narrative gains momentum, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." *Old Chief v. United States*, 519 U.S. 172, 187 (1997) (also noting "[p]eople who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard").

{¶ 25} Because the trial court limited Moreno's testimony to only mentioning she had a "medical condition," Moreno was unable to testify to key details about her behavior that night. Additionally, having been instructed she could not mention the fact that she was pregnant, Moreno testified she asked her neighbor to drive her to pick up Urbina but was then subject to a rigid cross-examination from the state in which the state accused her of "ma[king] a choice" of driving the van instead of taking her four-wheel drive Durango, to which Moreno could only offer up the explanation that she opted to take the van "[b]ecause of medical." (Tr. at 213.) Without being able to explain that she asked her friend to drive her because she was pregnant and had a high-risk pregnancy, the state was able to use cross-examination almost as an impeachment of her story, highlighting the areas that did not make sense without a more complete, descriptive picture of what happened that evening.

{¶ 26} Moreno also could not testify that she failed to return to the scene after leaving because she suffered a miscarriage. Instead, as instructed by the trial court, she could only mention that "a medical issue happened" preventing her from returning. (Tr. at 199.) Had Moreno been able to testify that she planned to return but began bleeding and would learn she was suffering a miscarriage, a jury would have had more details to understand her motivations for not returning to the scene as she had planned. Instead, the jury was left with a vague description of a "medical condition" without any details for the jury to assess whether or not Moreno was telling the truth. Though evidence that Moreno suffered a miscarriage may engender some sympathy from the jury toward Moreno, the danger of any unfair prejudice from that evidence is especially low given the highly probative nature of Moreno's testimony regarding why she was not initially driving her four-wheel drive vehicle and why she did not return to the scene after the accident.

{¶ 27} The state additionally argues that the trial court properly excluded Moreno's testimony regarding a miscarriage because Moreno was not an expert witness and only an expert witness could testify regarding the causation of a miscarriage. However, the relevant issue was not whether the accident caused the miscarriage, but the fact that Moreno had the miscarriage at that particular time, explaining her failure to return to the accident scene. Moreno was not expressing an expert opinion about what caused her miscarriage, and, thus, the state's argument is misplaced.

{¶ 28} We conclude, therefore, that the trial court abused its discretion in precluding Moreno from testifying about being pregnant or about suffering a miscarriage immediately after the accident. Moreno's descriptive, robust testimony of her actions the night of the accident would have aided the jury in assessing her credibility, and the danger of unfair prejudice of this testimony would not have outweighed its probative value. Accordingly, we sustain Urbina's first assignment of error.

## IV. Second Assignment of Error – Cancer Diagnosis

{¶ 29} In his second assignment of error, Urbina argues the trial court abused its discretion when it ruled Moreno could not mention her cancer diagnosis during her testimony. We again note that we review a trial court's evidentiary rulings for an abuse of discretion. *Darazim* at ¶ 33.

{¶ 30} In the discussion of the motion in limine, defense counsel stated he planned to question Moreno about her cancer diagnosis and:

> [t]he fact that she is currently being treated, and that counts for her appearance and her speech, the fact that she was in the hospital prior and left the hospital against medical advice to come to court to testify. That is relevant to her credibility, and it's relevant to her motivations.

(Tr. at 170.) The trial court sustained the state's motion and ruled Moreno "is not to discuss anything relating to medical conditions." (Tr. at 170.)

{¶ 31} The state argues the evidence regarding Moreno's cancer diagnosis has very limited relevance because it does not tend to show whether or not Urbina was driving the vehicle when it went off the road. Urbina responds, however, that the evidence would have helped the jury in assessing Moreno's credibility.

{¶ 32} Though we agree with Urbina that the evidence of Moreno's cancer diagnosis was relevant to the jury's assessment of her credibility, we also agree with the state that this information was not highly probative and carried the risk of unfair prejudice. Moreover, though Urbina argues this evidence would have explained Moreno's appearance and her speech, there is nothing in the record indicating her appearance was poor or her speech was difficult to understand. Without something in the record from which we can glean prejudice, we cannot say the trial court abused its discretion in excluding this evidence. Thus, we overrule Urbina's second assignment of error.

### V. Third Assignment of Error – Witness Intimidation

{¶ 33} In his third assignment of error, Urbina argues the trial court erred when it unfairly intimidated Moreno. More specifically, Urbina argues the trial court threatened Moreno right before she testified with perjury charges and prosecution on other charges.

{¶ 34} Initially, the state argues that because Urbina did not object to the trial court's statements to Moreno, Urbina has waived all but plain error. *State v. Jackson*, 92 Ohio St.3d 436, 444 (2001), citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus; Crim.R. 52(B). However, the United States Supreme Court has held that a defendant does not subject himself to a plain-error analysis on appeal when he does not object to a trial court's warning to a witness, noting "[t]he suggestion that the petitioner or his counsel should have interrupted the judge in the middle of his remarks to object is * * * not a basis

to ground a waiver of the petitioner's rights."  *Webb v. Texas*, 409 U.S. 95, 97 (1972).  In *Webb*, the Supreme Court held that a "[t]rial court's extended admonition to petitioner's only witness to refrain from lying, coupled with threats of dire consequences if witness did lie, effectively discouraged the witness from testifying at all and deprived petitioner of due process of law by denying him the opportunity to present witnesses in his own defense."  *Id.* at syllabus.  Additionally, "[c]ourts have recognized that it is within the sound discretion of the court to warn a witness about the possibility of incriminating herself * * * just so long as the court does not abuse that discretion by so actively encouraging a witness' silence that advice becomes intimidation."  (Internal quotations omitted.)  *State v. Hamilton*, 10th Dist. No. 10AP-543, 2011-Ohio-3305, ¶ 42.

{¶ 35} At trial, the following exchange occurred between the trial court and Moreno, outside the hearing of the jury:

> THE COURT: Okay. So here is the situation: It has been shared with me that you are prepared to get on the witness stand under oath and testify that on the night in question that you were operating the vehicle as it slid off the highway.
>
> MS. MORENO: Yes.
>
> THE COURT: Okay.  I want you to understand that by doing so, you run the risk of possibly incriminating yourself for both criminal and -- I'll say criminal possible penalties.
>
> MS. MORENO: Yeah, I understand.
>
> THE COURT: Do you understand what is meant by perjury?
> MS. MORENO: Yes.
>
> THE COURT: That's - -
>
> MS. MORENO: When you lie.
>
> THE COURT: - - when you lie under oath.
>
> MS. MORENO: Yeah.
>
> THE COURT: So I want to make sure you understand that, and perjury is a felony in the State of Ohio - -
>
> MS. MORENO: Yes.

THE COURT: - - for which you could be indicted and prosecuted.

MS. MORENO: Yes.

THE COURT: There's several charges that could arise from what I anticipate your testimony is going to be.

MS. MORENO: Uh-huh.

THE COURT: I don't know if you had a valid driver's license at the time, and I'm not asking you that.

MS. MORENO: Okay.

THE COURT: In fact, if you admit to driving, and it's determined that you were not a validly licensed driver, you could be charged with driving without a license or perhaps driving under a suspended license. And if you're charged under the Columbus City Code rather than the State Code, that charge could be a first-degree misdemeanor; and you could be jailed for up to six months and fined up to $1,000. Do you understand that?

MS. MORENO: Yeah.

THE COURT: If it is determined from your testimony that you were involved in an accident as a driver and you failed to remain behind and left the scene of the accident, you could be charged with a hit/skip - -

MS. MORENO: Hit/skip, yeah.

THE COURT: - - which is a first-degree misdemeanor; and you could also separately be prosecuted, convicted and sentenced to another six months and a possible $1,000 fine on that charge for leaving the scene of the accident. Do you understand that?

MS. MORENO: Yes, I do.

THE COURT: And I'm just throwing out there the charges that I think could possibly be evaluated by the Government.

MS. MORENO: Yeah.

THE COURT: You have a right to have an attorney present to represent you before or during your testimony.

MS. MORENO: Yes.

THE COURT: Do you wish to have an attorney present, or do you wish to waive your right to have an attorney present?

MS. MORENO: Waive my right.

THE COURT: Okay. With that, from either the defense or the prosecution, is there anything else you think I might need to advise her of in terms of making sure she understands the rights that she has and the rights she'll be giving up or waiving?

(Tr. at 175-78.)

{¶ 36} Urbina characterizes these statements from the trial court as unfair intimidation. However, when read in context, it does not appear the trial court is attempting to intimidate Moreno, only attempting to be sure she understands the possible consequences of her testimony, including possible perjury charges or other criminal charges related to admissions she may make about driving without a license and leaving the scene of an accident. This court has previously noted that "it may not be improper for the court or even a prosecutor to warn a witness of the penalties of perjury and his right against self-incrimination out of the hearing of the jury," as was done here. *State v. Halley*, 93 Ohio App.3d 71, 79 (10th Dist.1994). Furthermore, "the warning reaches the level of intimidation" and amounts to "reversible error" when it "interferes with a defendant's right to present witnesses." *Id.*, citing *Webb*. Here, Moreno testified, and the trial court's perjury warning, when read in context, did not reach the level of intimidation. Thus, we conclude the trial court's statements to Moreno before she testified did not interfere with Urbina's right to present a defense.

{¶ 37} Additionally under this assignment of error, Urbina argues the trial court unfairly intimidated Moreno in the presence of the jury when it remarked on her apparent nervousness and again reminded her to testify truthfully. More specifically, after Moreno took the stand in front of the jury, the following exchange occurred between the trial court and Moreno:

Q. * * * Now, a couple things. Have you ever testified in court before?

A. No.

Q. This is the first time?

A. Yes.

Q. Are you a little bit nervous?

A. (Indicating.)

Q. A lot nervous. I'm going to help you out here. A couple things and you'll be just fine. First of all, tell the truth in response to the questions that are asked of you.

If you're asked a question and you don't know the answer to the questions, simply say you don't know. If it's something you don't understand, then you might appropriately say - -

A. I don't understand.

Q. If there's something you don't remember. . .

A. I don't remember.

Q. You're doing so well. So just don't make up stuff. Okay?

A. Okay.

(Tr. at 182-83.) Again, when read in context, these statements from the trial court do not amount to intimidation of the witness. Moreover, to the extent Urbina argues Moreno's nervousness was a result of the trial court's prior perjury warning outside the hearing of the jury, there is nothing in the record to support that conclusion, nor does the record demonstrate that Moreno's nervousness interfered with her ability to present her testimony. Because we conclude the trial court did not improperly intimidate Moreno, we overrule Urbina's third assignment of error.

## VI. Fourth Assignment of Error – Improper Impeachment

{¶ 38} In his fourth assignment of error, Urbina argues the trial court erred in allowing the state to impeach Moreno's character by asking her questions about whether she had a valid driver's license at the time of the accident.  Additionally, Urbina argues the trial court erred in permitting the state to impermissibly cross-examine Moreno about her prior out-of-court statements.  We address each of these arguments separately.

### 1. Questions About Moreno's Driver's License

{¶ 39} Urbina first argues under this assignment of error that the trial court erred in allowing the state to question Moreno on cross-examination about whether she had a valid driver's license.  Because this argument challenges an evidentiary ruling of the trial court, we again note we review for an abuse of discretion.  *Darazim* at ¶ 33.

{¶ 40} Prior to Moreno's testimony, the state represented to the trial court its intention to question Moreno on cross-examination about the status of her driver's license.  Defense counsel objected, arguing that the status of Moreno's driver's license may be relevant evidence but potential unfair prejudice outweighs any relevance.  The trial court overruled the objection and noted the state could ask Moreno about her status as a licensed driver but could not "get[ ] into her entire driving record."  (Tr. at 181.)

{¶ 41} Here, we find no abuse of discretion in the trial court's determination that questions related to whether Moreno had a valid driver's license at the time of the accident were not unfairly prejudicial.  Urbina's defense was that he was not driving and that he asked Moreno to drive him that evening, and evidence related to whether Moreno maintained a valid driver's license is relevant to the plausibility of that story as well Moreno's overall credibility.  Thus, we agree with the state that the trial court did not abuse its discretion in permitting this line of questioning.

### 2. Questions About Prior Out-Of-Court Statements

{¶ 42} Urbina next argues under this assignment of error that the trial court erred in permitting the state to improperly cross-examine Moreno on her prior out-of-court statements.  As the state notes, Urbina did not object to this line of questioning at trial and thus has waived all but plain error.  *Jackson* at 444.  An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent

a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 43} For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 44} During the state's cross-examination of Moreno, the state asked Moreno about whether Urbina ever turned the vehicle on when he sat in the driver's seat after the vehicle slid off the road. Moreno responded she did not recall Urbina turning the vehicle on but that he just pushed on the clutch and moved the gear shifter. The following exchange then took place:

> Q. * * * But the car was in neutral when it was stopped, so he didn't have to engage the clutch unless the car was on?
>
> A. The car wasn't on. The only thing he did was push the clutch; and, I mean, I can't say what he was doing. He was in the driver's seat and I was - -
>
> Q. And the car rocked when he was in the driver's seat?
>
> A. No, it didn't move nowhere.
>
> Q. It didn't rock at all?
>
> A. It wouldn't move. It was stuck in the snow.
>
> Q. So you remember when we were talking to you on Monday, and you told us that the car rocked?
>
> A. No, I told you we were trying to move it; and it kept going more down and more down and more down in the snow.
>
> Q. So your story is different from what you told us on Monday?
>
> A. I don't recall telling you it rocked. I'm sorry.
>
> Q. Your testimony is different now from what it was previously, that it rocked. Just so we're clear, it did not rock?

A. It did not rock.

Q. And it wasn't on?

A. And it was not on.

Q. And that car - - Your testimony would also be that that car wasn't capable of being turned on at that point; was it?

A. It wasn't capable of what?

Q. Being turned on at that point.  It wouldn't turn on?

A. It could have turned on, but it was not on.

Q. So you didn't turn it on to try to get it out of the - -

A. We tried to push it up.  It wouldn't go.  It wouldn't move.

Q. You didn't turn it on and try to drive it out of the ditch. That's your testimony?

A. I tried to drive it the first time.  Like, I kept putting it in reverse, trying to get it, and driving it in reverse; and every time I did it, it just went deeper and deeper in the snow.

Q. But your testimony is that when he was in the car, it wasn't actually on; right?

A. No, it wasn't actually on.

Q. Do you understand that's different from what you told us the other day?

A. I don't recall what I said.

Q. I understand you don't recall, but do you understand that that's different?

A. No, I don't understand.

(Tr. at 219-21.)

{¶ 45} Urbina argues this colloquy amounts to the state improperly impeaching Moreno's credibility by erroneously attempting to introduce into evidence Moreno's alleged prior unsworn statements. In *State v. Hunt*, 97 Ohio App.3d 372 (10th Dist.1994),

we reversed a defendant's conviction of felonious assault where "the prosecuting attorney presented damaging facts to the jury under the guise of asking appellant a question." *Id.* at 375. In so doing, we stated " '[i]t is highly improper for any lawyer in the trial of any jury case, civil or criminal, to make what amounts to testimonial assertions under the pretext that he is merely "asking a question." ' " *Id.*, quoting *State v. Daugherty*, 41 Ohio App.3d 91, 92 (5th Dist.1987). *See also State v. Davis*, 10th Dist. No. 01AP-579 (Apr. 18, 2002) (finding prejudicial plain error from the prosecutor's line of questioning to the defendant insinuating that the defendant confessed to his cousin "when either there existed no factual predicate for that information and/or no testimony of such confession was put into evidence").

{¶ 46} We are mindful that the state's conduct on cross-examination is not grounds for reversal unless the defendant has been denied a fair trial. *State v. Ndiaye*, 10th Dist. No. 13AP-964, 2014-Ohio-3206, ¶ 14, citing *State v. Maurer*, 15 Ohio St.3d 239, 266 (1984); *Davis*. Additionally, " 'it must be clear beyond a reasonable doubt that absent the conduct of the prosecution, the jury would have found the defendant guilty.' " *Davis*, quoting *State v. Vrona*, 47 Ohio App.3d 145, 154 (9th Dist.1988), citing *Maurer* at 266-68.

{¶ 47} In *Hunt*, we found the prosecutor's line of questions affected the defendant's substantial rights and deprived the defendant of a fair trial because "the questions posed went to the very heart of the case because the entire case hinged on the credibility of the witnesses." *Hunt* at 376 (noting "[t]he entire case turned on the credibility of the witnesses and who the jurors believed"). The same is true here. Urbina's entire defense was that he was not driving the vehicle at the time of the accident, and his only witness in support of his defense was Moreno. By allowing the state to insinuate through cross-examination that Moreno had previously told prosecutors a different version of events, the state was able to effectively undermine Moreno's credibility and therefore deprive Urbina of his right to a fair trial.

{¶ 48} In sum, the trial court did not abuse its discretion in permitting the state to cross-examine Moreno about the status of her driver's license. However, because the state's line of questions about Moreno's pre-trial, unsworn statements served to

undermine Moreno's credibility and deprive Urbina of a fair trial, we overrule in part and sustain in part Urbina's fourth assignment of error.

## VII. Sixth Assignment of Error – Trooper Dabo's Opinion Testimony

{¶ 49} For ease of discussion, we address Urbina's final two assignments of error out of order. In his sixth assignment of error, Urbina argues the trial court abused its discretion by permitting Trooper Dabo to give opinion testimony about the length of time that had elapsed from when the vehicle skidded off the road to when Trooper Dabo arrived on the scene.

{¶ 50} On direct examination, the state asked Trooper Dabo about his observations as he approached the vehicle at the scene of the accident. Trooper Dabo stated it was snowing outside and had been snowing for three or four hours before the accident. He further testified that he saw skid marks in the snow as he approached the Civic. The following exchange then occurred:

> Q. Now, I'm not asking you to play weatherman; but based upon how hard it was snowing that day, you made an estimate of how long that motor vehicle had been there?
>
> [DEFENSE COUNSEL]: Objection, Your Honor.
>
> THE COURT: Basis?
>
> [DEFENSE COUNSEL]: Calls for expert testimony.
>
> [THE STATE]: I'm asking - -
>
> THE COURT: The question was about how long the snow - -
>
> Would you repeat that?
>
> [THE STATE]: Your Honor, I'm asking for a personal observation about how long it would take for the snow to cover the tire tracks. The trooper was there. He made a personal observation.
>
> [DEFENSE COUNSEL]: Your Honor, that calls for a conclusion as to a scientific finding that there's been no demonstration on how the trooper is qualified to make that.

THE COURT: I'm going to overrule the motion for now. I'll hear the answer, and we'll see if it's something that we need to address further from there.

Would you repeat the question?

[THE STATE]: I'm going to break this up in pieces.

Q. It's snowing when you arrive?

A. That is correct.

Q. And you were able to see tire tread tracks?

A. That's correct.

Q. Did it continue to snow during your contact with the defendant?

A. Yes, that is correct.

Q. Okay. Were you able to make any observations about the tire treads after a period of time?

A. Yeah. I mean, I could tell that he was probably there less than ten minutes before I got there.

Q. And this is based upon what?

A. Based upon the tire tread markings. I mean, they hadn't covered up because it was still snowing; and, I mean, you could clearly see the impression of the tire marks right on the snow.

(Tr. at 52-53.) Urbina argues this is impermissible lay opinion testimony and the question of the age of a tire track in the snow is a question for an expert witness.

{¶ 51} Pursuant to Evid.R. 701, opinion testimony by a lay witness is admissible regarding those opinions or inferences which are "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." In contrast, Evid.R. 702 provides a witness may testify as an expert if all of the following apply:

(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 52} Generally, lay witnesses may give their opinions on matters they have actually observed "such as the speed that an automobile was traveling, the weather conditions observed, or the apparent drunkenness of a person." *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109 (1989), fn. 2. Thus, Trooper Dabo was able to testify that it was snowing and could render a lay opinion on whether the snow was falling quickly or slowly based on his observations. However, we disagree with the trial court that the amount of time it would take for snow falling at a certain rate to cover up tire tracks is a matter that would be rationally based on the perception of the witness. Trooper Dabo testified specifically that the tire tracks were in the snow no more than ten minutes. This is a matter "beyond the knowledge or experience possessed by lay persons" and would require "specialized knowledge, skill, experience, training, or education" or "reliable scientific, technical, or other specialized information" in order to be able to determine with reliability. Evid.R. 702. *See also Wise v. Meyer*, 2d Dist. No. 2005 CA 113, 2006-Ohio-4654, ¶ 44 (noting "[a]ccident reconstruction is a highly technical area" requiring expert testimony); *State v. Minor*, 47 Ohio App.3d 22, 24 (10th Dist.1988) (explaining the

two-step process outlined in Evid.R. 702 and 703 that a trial court must first determine whether "the scientific, technical or specialized opinion be reliable" in determining "whether the witness is qualified to give an expert opinion").

{¶ 53} There was no foundation testimony establishing Trooper Dabo as an expert in the rate of snowfall, snow accumulation, or determining the precise age of tire tracks in fallen snow. Trooper Dabo testified to a specific amount of time the tire tracks had been in the snow, opining the tracks had been there "less than ten minutes," without the proper foundational support of an expert witness. Accordingly, we conclude the trial court abused its discretion in allowing Trooper Dabo to render an impermissible lay opinion on the amount of time the tire tracks had been in the snow. We sustain Urbina's sixth assignment of error.

## VIII. Fifth Assignment of Error – HGN Test

{¶ 54} In his fifth assignment of error, Urbina argues the trial court erred when it refused to let defense counsel cross-examine Trooper Dabo on the manner in which Trooper Dabo administered the HGN test.

{¶ 55} On direct examination, the state questioned Trooper Dabo extensively regarding the manner in which he administered the HGN test and the signs of intoxication Trooper Dabo observed from that test. When defense counsel attempted to cross-examine Trooper Dabo regarding the HGN test, the trial court sustained the state's objection that Urbina could not question Trooper Dabo about the HGN test because Urbina did not file a timely motion to suppress.

{¶ 56} The state concedes it was error for the trial court to prevent Urbina from cross-examining Trooper Dabo regarding his administration of the HGN test. *State v. Boczar*, 113 Ohio St.3d 148, 2007-Ohio-1251, ¶ 23 (noting the General Assembly has determined field sobriety tests are admissible when an officer substantially complies with the National Highway Traffic Safety Administration standards, and that "[t]he potential compromise of reliability caused by the lack of strict compliance can be shown by the defense on cross-examination"). Nonetheless, the state argues the trial court's ruling in this matter was harmless error because Urbina was convicted of both OVI and OVI per se, and the results of the HGN test are irrelevant to the OVI per se conviction. *See State v. Green*, 66 Ohio St.3d 141, 148 (1993) (stating "[l]ack of an opportunity to fully cross-

examine is harmless error when there is overwhelming, untainted evidence supporting a conviction"). Given the other errors at trial requiring reversal, we need not decide whether the trial court's error in refusing cross-examination on the HGN test was harmless. Accordingly, we render moot Urbina's fifth assignment of error.

## IX. Disposition

{¶ 57} Based on the foregoing reasons, the trial court did not abuse its discretion in precluding Moreno's testimony regarding her cancer diagnosis, did not abuse its discretion in allowing the state to question Moreno about the status of her driver's license, and did not improperly intimidate Moreno by reminding her of her right against self-incrimination and in explaining perjury to her. However, the trial court abused its discretion in not allowing Moreno to testify specifically regarding suffering a miscarriage immediately following the accident and abused its discretion in allowing Trooper Dabo to render an impermissible lay opinion. Additionally, the state's questions to Moreno on cross-examination regarding statements she had made out of court operated to deprive Urbina of a fair trial. Because these errors require reversal, we need not determine whether Urbina suffered any prejudice as a result of the trial court's error in refusing to allow him to cross-examine Trooper Dabo on the administration of the HGN test. Having overruled Urbina's second and third assignments of error, overruled in part and sustained in part Urbina's fourth assignment of error, sustained Urbina's first and sixth assignments of error, and rendered moot Urbina's fifth assignment of error, we reverse the judgment entry of the Franklin County Municipal Court and remand the matter to that court for further proceedings consistent with this decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

BROWN, J., concurs.
DORRIAN, P.J., concurs in part and concurs in judgment.

DORRIAN, P.J., concurring part and concurring in judgment.

{¶ 58} I concur with the majority in its resolution of all assignments of error, with the exception that I would also sustain the second assignment of error. I concur with the majority and would reverse the judgment of the trial court.