[Cite as *State v. Ireland*, 2019-Ohio-1002.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 15AP-1134 |
| v. | : | (C.P.C. No. 14CR-362) |
| Darin K. Ireland, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 21, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton*.

**On brief:** *Giorgianni Law LLC*, and *Paul Giorgianni*, for appellant. **Argued:** *Paul Giorgianni*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} This case is before the court on remand from the Supreme Court of Ohio pursuant to *State v. Ireland*, __ Ohio St.3d __, 2018-Ohio-4494 ("*Ireland II*"). The Supreme Court reversed our judgment in *State v. Ireland*, 10th Dist. No. 15AP-1134, 2017-Ohio-263 ("*Ireland I*"), and remanded the case for application of its holding as to the first assignment of error and to address the remaining assignments of error.

{¶ 2} Defendant-appellant,[1] Darin K. Ireland, appeals the December 8, 2015 judgment of the Franklin County Court of Common Pleas convicting him, pursuant to a jury verdict, and imposing sentence.

---

[1] Because the state appealed our decision in *Ireland I*, in *Ireland II*, the Supreme Court referred to Defendant-Ireland as appellee and Plaintiff-State as appellant. However, as the Supreme Court reversed and remanded the case to us, now again, before us, Defendant-Ireland is appellant and will be referred to herein as either appellant or defendant-appellant. The state, which is now again the appellee, before us, will be referred to herein as either the state or plaintiff-appellee.

## I. Facts, Procedural History and First Assignment of Error

{¶ 3}    The facts and procedural history of this case are outlined in this court's decision in *Ireland I* and in the Supreme Court's decision in *Ireland II.*

{¶ 4}    As relevant here, in *Ireland I*, in a split decision, this court addressed the first assignment of error, found the first assignment of error to be dispositive, and rendered moot the remaining assignments of error.  In his first assignment of error, appellant argued:

> The court instructed the jury that [appellant] had the burden of proving his defense [of blackout resulting from PTSD], thereby depriving [appellant] of his constitutional right to a jury trial under the "beyond a reasonable doubt" standard of proof.

{¶ 5}    We held that because plaintiff-appellee, State of Ohio, bears the burden of proving beyond a reasonable doubt that the defendant committed a voluntary act, the trial court committed structural error by instructing the jury that appellant bore the burden of establishing post-traumatic stress disorder-induced ("PTSD") blackout,[2] i.e., that appellant acted involuntarily, by a preponderance of the evidence as an affirmative defense.  *Ireland I* at ¶ 42. We therefore sustained the first assignment of error, reversed appellant's conviction, and remanded this matter to the trial court for further proceedings consistent with law and our decision.

{¶ 6}    The state timely appealed to the Supreme Court.  The court accepted review of the state's sole proposition of law: "The defense of blackout or automatism is an affirmative defense that must be proven by a defendant by a preponderance of the evidence, because it involves an excuse or justification peculiarly within the knowledge of the accused, on which the accused can fairly be required to adduce supporting evidence."  *Ireland I* at ¶ 10.

{¶ 7}    A majority of the Supreme Court, in a split decision, concluded the trial court did not err in instructing the jury that appellant's defense[3] was an affirmative defense that

---

[2]  We expressly limited our holding to claims of involuntariness resulting from PTSD-induced blackout and noted that our holding did not implicate cases involving the voluntary intoxication of the defendant, which is governed by R.C. 2901.21(D).

[3] The lead opinion of Justice Fischer, with Justice O'Donnell concurring, characterized appellant's defense as a blackout defense. Concurring in judgment only, Justice DeGenaro, with Justice French concurring, characterized appellant's defense as an "insanity-related defense." *Ireland II* at ¶ 50. Chief Justice O'Connor concurred in judgment only without opinion. Justice Kennedy dissented with Justice DeWine joining her.

appellant had to prove by a preponderance of the evidence. The court therefore reversed our judgment in *Ireland I* and remanded the case to us for consideration of appellant's remaining assignments of error.

{¶ 8} The Supreme Court decided *Ireland II* on November 8, 2018. On November 19, 2018, defendant-appellant filed a motion to reconsider. While the motion to reconsider was still pending, defendant-appellant filed a motion to dismiss by virtue of abatement on December 18, 2018. With the motion, defendant-appellant's attorney of record, Paul Giorgianni, notified the court that defendant-appellant had died. Attorney Giorgianni requested the Supreme Court dismiss the appeal as moot, vacate the judgment of conviction, and dismiss all related criminal proceedings, including the original indictment pursuant to *State v. McGettrick*, 31 Ohio St.3d 138 (1987). On December 19, 2018, the state filed a memorandum contra the motion to dismiss by virtue of abatement and moved the Supreme Court to substitute Attorney Giorgianni as the party-defendant appellee.[4] On December 21, 2018, the Supreme Court denied the motion for reconsideration, denied the motion to dismiss by virtue of abatement but granted the state's motion to substitute Attorney Giorgianni as the "party defendant."[5]

{¶ 9} Upon remand, on January 8, 2019, this court filed a journal entry reactivating the appeal. The parties were notified. No motions have been filed in this court. Therefore, as the Supreme Court denied the motion to dismiss by virtue of abatement and granted the motion to substitute Attorney Giorgianni as the party defendant, we will proceed to determine the appeal as instructed by the Supreme Court.

{¶ 10} Accordingly, applying the Supreme Court's conclusion in *Ireland II* to the first assignment of error, we overrule appellant's first assignment of error.

{¶ 11} We now proceed to address appellant's remaining assignments of error:

> [II.] Prosecutorial misconduct during closing argument violated [appellant's] due-process right to a fair trial.

> [III.] The cumulative effect of errors violated [appellant's] due-process right to a fair trial.

> [IV.] The judge misstated OJI 417.07 by omitting the word "unconscious."

---

[4] *See* fn. 1.
[5] *See* fn. 1.

[V.] The judge failed to give a curative instruction when the State's psychology expert purported to tell the jury "what the law requires."

## II. Second Assignment of Error

{¶ 12} In the second assignment of error, appellant alleges multiple instances of prosecutorial misconduct during closing argument.

### A. Standard for Prosecutorial Conduct

{¶ 13} The test for prosecutorial misconduct in closing arguments " 'is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.' " *State v. Hussein*, 10th Dist. No. 15AP-1093, 2017-Ohio-5519, ¶ 14, quoting *State v. Smith*, 14 Ohio St.3d 13, 14 (1984), citing *United States v. Dorr*, 636 F.2d 117 (5th Cir.1981). The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Id.*, citing *State v. Wilkerson*, 10th Dist. No. 01AP-1127, 2002-Ohio-5416, ¶ 38; *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Thus, prosecutorial misconduct is not grounds for reversal unless the defendant has been denied a fair trial. *Id.*, citing *State v. Maurer*, 15 Ohio St.3d 239, 266 (1984). To evaluate allegations of prosecutorial misconduct, we " 'must determine (1) whether the prosecutor's conduct was improper and (2) if so, whether it prejudicially affected [the defendant's] substantial rights.' * * * We 'will not deem a trial unfair if, in the context of the entire trial, it appears clear beyond a reasonable doubt that the jury would have found the defendant guilty even' absent the misconduct." *State v. Shine-Johnson*, 10th Dist. No. 17AP-194, 2018-Ohio-3347, ¶ 73, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 121.

{¶ 14} We find that even if some of the prosecutor's remarks were improper, they did not prejudicially affect the substantial rights of appellant. Appellant's trial was fair.

### B. Alleged Misrepresentations of Law

{¶ 15} Appellant argues the prosecutor misrepresented the law. First, he alleges the prosecutor misrepresented the law when he stated that being unconscious and unable to control oneself "is not at all valid defense to this crime." (Tr. Vol. V at 594-95.) The context of the prosecutor's statement, however, was not a statement of law but, rather, an argument that that particular defense did not apply to these particular facts. Therefore, we do not find the prosecutor's statement to be improper.

{¶ 16} Second, appellant argues the prosecutor misrepresented the law by arguing that Dr. Reardon's report was deficient because it did not use the term "blackout." Specifically, appellant points to the prosecutor's statement that Dr. Reardon "didn't say because of PTSD or blackout state. I don't even think he used the word 'blackout.' He just talked about the dissociation." (Tr. Vol. V at 597.) Appellant seems to argue the prosecutor should have considered whether Dr. Reardon's report used the term "voluntary act" as that term is used to describe the actus reus in R.C. 2901.21(A)(1). However, the context of this statement reveals the prosecutor was referring to the defense of blackout, rather than the actus reus. Appellant himself points out Ohio Jury Instructions, CR Section 417.07, titled "Coma, blackout," states: "[w]here a person commits an act while unconscious as in a (coma) (blackout) (convulsion)." Neither coma nor convulsion were at issue here. Therefore, we do not find the prosecutor's statement to be improper.

{¶ 17} Third, appellant argues the prosecutor misrepresented the law when she told the jury they had to believe Dr. Reardon "beyond a reasonable doubt." "Even if you believe Dr. Reardon's theory of this case, he can't reach a definitive conclusion. * * * He has to be 100 percent affirmative on that, and you have to believe it beyond a reasonable doubt." (Tr. Vol. V at 596.) The state concedes this was a misstatement. We find the prosecutor's statement to be improper. However, we do not find the statement prejudicially affected the substantial rights of appellant. In her rebuttal closing, the prosecutor again made a similar reference to "beyond a reasonable doubt" being the standard for finding appellant was unconscious. The trial court intervened, "[n]o, no. Let's not shift the burden. He has the preponderance of the evidence in his affirmative defense." (Tr. Vol. V at 634.) The prosecutor acknowledged the same and went on to state that "[y]ou have to believe by a preponderance of the evidence that this is the case, not that this is the case since Dr. Reardon even say [sic] it conclusively, but you have to believe by a preponderance of the evidence that [appellant] was unconscious at the time of this act." (Tr. Vol. V at 635.) Therefore, we do not find the prosecutor's improper statement resulted in a denial of a fair trial for appellant.

{¶ 18} Fourth, appellant argues the prosecutor's reference to appellant as a "co-principal" with Tyler Thrash was a misrepresentation of the law. Appellant points to the prosecutor's statement that "[t]he second argument as to injuries is that they're coprincipals. When there's multiple causes of a harm and there's no way to segregate it --

even the doctor said, 'I can't tell you exactly how the injury was inflicted.' So when you can't say, 'This person did this injury,' the offenders are liable as principals for the injuries as a whole." (Tr. Vol. V at 588.)   Appellant does not support his argument except to say there was no evidence that he conspired with Thrash.  However, the prosecutor did not make such a suggestion but, rather, argued appellant was guilty "no matter what Tyler Thrash did in this case." (Tr. Vol. V at 588.)  Therefore, we do not find the prosecutor's statement to be improper.

### C. Alleged Misrepresentation of Facts

{¶ 19}  In addition to arguing the prosecutor misrepresented the law, appellant also argues the prosecutor misrepresented the facts.  To begin, we note, and will explain in further detail below, that, in closing argument, appellant's counsel thoroughly rebutted almost every alleged misrepresentation of fact that appellant argues the prosecutor made in the state's closing argument.  With this in mind, even assuming arguendo that the prosecutor did make the alleged misrepresentations of facts, we do not find the statements prejudicially affected the substantial rights of appellant.

### 1. <u>Alleged misrepresentation of appellant's medical history</u>

{¶ 20} First, appellant argues the prosecutor misrepresented his medical history when she told the jury "[Dr. Reardon's] opinion was contradicted by every other professional who has seen the defendant[.] * * * Six different doctors and licensed social workers at the VA all assessed him and all found him negative for PTSD. * * * Isn't it convenient, ladies and gentlemen, that * * * all the people who evaluate[d] him actually said he didn't have it, that he didn't have PTSD." (Tr. Vol. V, at 595-96, 598, 602.) Appellant's counsel addressed this statement head on in his closing argument:

> And, you know what's noteworthy about that -- just while I'm on that topic, it's been said that people from the VA evaluated [appellant] and that all of those people said he didn't have PTSD. Let's clarify that. All of those people don't do psychological evaluations. They were social workers, nurses, whatever. There was only one psychologist that either worked for or was associated with the VA, and that was Dr. Ray, who did an evaluation.
>
> And as much as Dr. Eshbaugh didn't want to say it, Dr. Ray didn't complete the evaluation apparently because [appellant] wouldn't answer the questions about the stressor events because it was so difficult for him. So Dr. Ray concluded it wasn't that [appellant] didn't have PTSD. What he concluded

> was: "It's impossible for me to determine. I can't say beyond mere speculation whether he has PTSD."
>
> So it's not accurate to say all of these people from the VA diagnosed him as not having PTSD. It's not true at all.
>
> There was one other person -- other than Dr. Reardon, there was one other person in this case that did a full evaluation. That was Dr. Levy. We didn't hear from Dr. Levy, but you heard about him, and you heard about him from Dr. Eshbaugh. Dr. Eshbaugh said that Dr. Levy is a psychiatrist. Dr. Levy has a great reputation as a psychiatrist in Central Ohio, and Dr. Levy's conclusion -- he actually had more than one -- was the same as Dr. Reardon's.
>
> So the only other professional that has actually done an evaluation of [appellant's] psychological condition says he has PTSD. He also diagnosed alcohol abuse disorder, and I think he had an additional diagnosis. If I remember correctly, it was anxiety disorder. So that's what all the professionals have to say.

(Tr. Vol. V at 613-14.)

{¶ 21} Given appellant's counsel's thorough rebuttal to the prosecutor's statement, we cannot say that such statement resulted in denial of a fair trial to appellant.

### 2. **Alleged misrepresentation of Dr. Reardon's opinion**

{¶ 22} Next, appellant argues the prosecutor misrepresented Dr. Reardon's opinion by: (1) arguing that Dr. Reardon failed to consider the primary diagnosis of alcoholism; (2) by inferring that the information Dr. Reardon collected was biased, faulty, and incomplete; and (3) by telling the jury that Dr. Reardon was not conclusive on the issue of unconsciousness. Once again, appellant's counsel thoroughly addressed each of these statements.

{¶ 23} Regarding failure to consider a diagnosis of alcoholism, it is clear from the record that Dr. Reardon did consider a diagnosis of alcoholism. Therefore, the prosecutor's statement was improper. However, appellant's counsel thoroughly rebutted the statement as follows:

> And he was asked on the stand, "Couldn't this have just been an alcoholic blackout? You didn't even consider that?"
>
> He said, "Actually, I did consider that, and that wasn't my conclusion. My conclusion was that it's likely [appellant],

during this incident, experienced a dissociative episode." Those were his words. That was his conclusion. He absolutely tied the testing and his conclusions to what happened in this case.

* * *

Dr. Reardon did diagnose alcohol abuse disorder, and he said right to everybody, "[appellant] has a serious alcohol problem."

Dr. Eshbaugh says he's minimizing it. I don't know how that's minimizing. He diagnosed it. He said it's serious. He put it in his report, and he said it on the stand but also admits it's not just one diagnosis. So the criticism from Eshbaugh is: You didn't put it in your differential diagnosis. You just want PTSD. No, he didn't. He did said [sic] alcohol abuse disorder also.

* * *

He was asked, "Could it have been an alcoholic blackout?"
"I considered that. That's not my opinion. My opinion is he was having a dissociative episode at the time."

(Tr. Vol. V at 617, 620-21, 629-30.)

{¶ 24} Regarding an inference that Dr. Reardon's information was biased, faulty, and incomplete, indeed the prosecutor generally characterized Dr. Reardon's information based on the testimony of Dr. Eshbaugh, the state's expert. Dr. Eshbaugh testified that Dr. Reardon's report contained "nothing in here about verification" and lacked reasonable detail about his reasoning and conclusions. (Tr. Vol. IV at 484.) Dr. Eshbaugh further testified Dr. Reardon's diagnosis of PTSD was "like making a decision before you have the information." (Tr. Vol. IV at 483.) The state's characterization was not necessarily improper but could be countered with reference to opposing expert testimony. Appellant's counsel did exactly that in his rebuttal to the state's closing:

He didn't just ask [appellant] some questions and say, "The guy's got PTSD." He administered a number of -- I don't remember what the number was exactly, but he told you about all of the different tests: the PAI, the SIRS, the SIMS, the DES. There must be seven or eight of them. And his conclusion was that they all pointed to one conclusion regarding trauma, and that was PTSD.

* * *

Based on all of his years of experience doing trauma work, he knows how to do interviews. He did an extensive interview. You didn't hear every detail from it, but you heard parts of it. Then he knows what are the tests that are appropriate to give in a case like this, and he gave all the standardized tests that a psychologist should give in a case like this, and he explained to you -- I think he explained most of them.

With three of them, he went through it very methodically, took a while, but he went through it methodically because he wanted everyone to understand these are the scores, and these are what the scores mean. It's not his interpretation of the scores.

This is all in the manual that tells him: If he answers these ways, that is what it means. It's a standardized test. It's done the same way every time. It's scored the same way every time.

It wasn't one standardized test, and it wasn't one question in a questionnaire. These were hundreds of questions with, he said, valid construct or something like that. They're valid tests. And not just one of the tests, but all of the tests pointed to the conclusion that [appellant] has PTSD and that [appellant] has dissociative episodes.

And you didn't hear every detail of every day of his life. Now, it's been suggested that the only time he ever had any problems was at night in his sleep. Those were a couple of the examples that were given to you by Dr. Reardon. It doesn't mean it didn't happen any other time.

But what we do know from Dr. Reardon's testimony regarding his interview with [appellant] and Pam is that when you look at the criteria -- which he actually did look at the criteria that you're supposed to look at. He went through every one of those methodically, too, every one of them, A through H, or whatever it was, and showed he has this, he has this and this, and all the subsections and how they apply. He compared that to [appellant's] answers in the interview and on the standardized testing.

And so he talked about -- he did talk about nightmares, but he also talked about flashbacks, other dissociative episodes throughout his life since he returned from the war, not just recently. It just isn't something that started recently. He said this has been going on since he returned from the war. And,

yes, he did talk about alcohol because, as he seemed to indicate, that's what a lot of the combat veterans do, unfortunately.

But there was a suggestion that 22 years and he's fine, and now, all of a sudden, he's claiming that he's having these problems. That's not accurate at all. That's not at all what he told Dr. Reardon, and that's not at all what Dr. Reardon told you.

Dr. Reardon told you, when he was talking about the first criteria, that was -- oh, one of the criteria was intrusive thoughts. Just to clarify, that's one of the criteria. And Dr. Reardon said he has these intrusive thoughts and nightmares and flashbacks regarding his military experience, but he did not say, because it's not the case, that he had an intrusive thought at the time of the dissociative episode, and the only kind of dissociative episode is one where you're firing -- you know, pointing a stick at something as though you're firing a gun. That's not how it works.

* * *

That was based on Dr. Reardon's review of records, his interview of [appellant], the standardized testing.

(Tr. Vol. V at 613, 623-27.)

{¶ 25} Finally, regarding the statement that Dr. Reardon was not conclusive on the issue of unconsciousness, appellant's counsel rebutted:

His other criticism, one of them -- and this had been repeated more than once -- Dr. Reardon didn't say how [appellant's] PTSD affected this case.

* * *

Here's what his conclusion is, that Dr. Eshbaugh said, yes, that was his conclusion. It is likely that his consciousness, memory, critical judgment, and decision-making ability were adversely affected by the PTSD and the dissociative episode that he experienced. That was his conclusion.

* * *

So you have someone who is truly an expert, who truly did an evaluation, reach that conclusion: [appellant] has PTSD. No question about it. [Appellant] suffers from dissociative episodes. No question about it. At the time of his incident, it is

> likely that he was experiencing a dissociative episode. That's what the experts say.
>
> Can he say -- can the expert now suggest -- he has to tell you a hundred percent that he's certain that [appellant] was experiencing a dissociative episode? He can't say that. He's not a mind reader. He can say based on what he knows, all of his knowledge and experience and expertise, and based on his review of the documents -- and, by the way, he did review all the police reports. He did review all the witness statements. He had all that information. His conclusion: This was a dissociative episode.
>
> He can't say 100 percent, but he can say, "Based on what I've seen, that is my opinion."
>
> He was asked, "Could it have been an alcoholic blackout?"
>
> "I considered that. That's not my opinion. My opinion is he was having a dissociative episode at the time."

(Tr. Vol. V at 617, 629-30.)

{¶ 26} As noted above, taking into consideration appellant's counsel's thorough closing argument, we do not find any improper representation of fact regarding Dr. Reardon's opinion resulted in denial of a fair trial to appellant.

### 3. <u>Alleged misrepresentation of Dr. Reardon's investigation</u>

{¶ 27} In addition to alleging the prosecutor misrepresented Dr. Reardon's opinion, appellant also alleges the prosecutor misrepresented Dr. Reardon's investigation. Appellant argues that it was a misrepresentation to say that Dr. Reardon "went in with a diagnosis[:] he went in with a working assumption that [appellant] already had it." (Tr. Vol. V at 633.) The state's general characterization of Dr. Reardon's investigation is consistent with its general characterization of Dr. Reardon's information on which he based his opinion—that it was biased, faulty, and incomplete. As noted previously, the state's characterization is based on Dr. Eshbaugh's characterization of Dr. Reardon's investigation. Such characterization was not necessarily improper, but could be countered with reference to opposing expert testimony. The prosecutor made this statement in her rebuttal closing and, therefore, appellant did not have an opportunity to respond. However, appellant's counsel anticipated the argument and addressed in appellant's closing argument:

> He didn't just ask [appellant] some questions and say, "The guy's got PTSD." He administered a number of -- I don't

remember what the number was exactly, but he told you about all of the different tests: the PAI, the SIRS, the SIMS, the DES. There must be seven or eight of them. And his conclusion was that they all pointed to one conclusion regarding trauma, and that was PTSD.

* * *

So one of his criticisms was that Dr. Reardon had a working diagnosis, and he thought that was really significant. He was always big on verification, and I thought that was a pretty big claim for him to make that Dr. Reardon had done something wrong by having a working diagnosis.

I don't know what all the details are about, what's wrong with that in the profession, but he seemed to think that was an issue. But then when I asked him about it, he said, "I don't know who wrote that on there or when."

And I reminded him how big he was on verification. He had that big, thick file with all the documents in this case. I said, "Could you show us where you saw that?" He couldn't. It's not there. There's no evidence of it.

* * *

Dr. Reardon, on the other hand, he didn't -- he described the purpose of his evaluation. The purpose of his evaluation wasn't to determine whether or not [appellant] has PTSD. The purpose of his evaluation was to determine whether or not he has a psychological condition and whether or not that condition played a role in this incident. And he's not just a trauma guy, like Eshbaugh said. Eshbaugh, you know, he's the carpenter and the nail. Everything to him is alcohol abuse. Dr. Reardon is not everything is PTSD.

If you recall his testimony, he ran a drug and alcohol rehabilitation center for years, CompDrug, I think was the one. He has diagnosed and treated hundreds of people with alcohol and drug use disorders. So he wasn't just going into this saying, "Does the guy have PTSD or not?" and working toward yes.

Based on all of his years of experience doing trauma work he knows how to do interviews. He did an extensive interview. You didn't hear every detail from it, but you heard parts of it. Then he knows what are the tests that are appropriate to give in a case like this, and he gave all the standardized tests that a

psychologist should give in a case like this, and he explained to you -- I think he explained most of them.

(Tr. Vol. V at 613, 616-17, 622-23.)

{¶ 28} Therefore, even assuming, arguendo, the prosecutor's characterization of Dr. Reardon's investigation was improper, given appellant's counsel's thorough rebuttal, we do not find the statements prejudicially affected the substantial rights of appellant or resulted in denial of a fair trial to him.

### 4. **Alleged misrepresentation of the evidence regarding what occurred after the attack**

{¶ 29} Appellant argues the prosecutor misrepresented the evidence when she told the jury that appellant departed the bar because "[h]e knows that 911 has been called," and further when she stated appellant "has the consciousness to get out of the car [at his home] before [Pam] comes back" to the bar. (Tr. Vol V at 608.) Appellant did not testify, as he was not required to. Therefore, there is no direct evidence regarding what he was thinking when he departed the bar and did not return later with his wife. However, direct evidence and circumstantial evidence are of equal weight, and it was not improper of the prosecutor to suggest to the jury that circumstantial evidence supported a finding of guilt. Furthermore, analogously, the law instructs that since it is impossible to look into the mind of another, "[t]he existence of a 'knowing' state of mind as an element of a criminal offense 'is to be determined from all the attendant facts and circumstances available.' " *State v. Thompson*, 10th Dist. No. 16AP-812, 2017-Ohio-8375, ¶ 22, quoting *State v. Teamer*, 82 Ohio St.3d 490, 492 (1998). The prosecutor argued the jury could infer appellant was conscious from the direct evidence that he departed the bar after 911 had been called and did not return with his wife later. The prosecutor's statement was not improper.

{¶ 30} We find that any improper statements by the prosecutor, whether legal or factual, did not prejudicially affect the substantial rights of appellant or result in denial of a fair trial to him.

{¶ 31} Accordingly, we overrule appellant's second assignment of error.

### III. Fourth Assignment of Error

{¶ 32} In his fourth assignment of error, appellant argues that when the judge verbally charged the jury, he omitted the word "unconscious" and stated instead "Where a person commits an act while, as in a coma, blackout or convulsion." (Tr. Vol. V at 647.)

Appellant concedes, however, that the jurors were provided written jury instructions to take back to deliberations and that the written jury instructions contained the correct language.

{¶ 33} Indeed, the written jury instructions state:

> Where a person commits an act while unconscious as in a coma, blackout, or convulsion due to heart failure, disease, sleep, or injury, such act is not a criminal offense even though it would be a crime if such act were the product of a person's will or volition.

(Jury Instructions at 7.)

{¶ 34} Other than to point out the court's omission when verbally charging the jury, appellant makes no argument in his brief that he was prejudiced as a consequence thereof.

{¶ 35} Accordingly, we overrule appellant's fourth assignment of error.

## IV. Fifth Assignment of Error

{¶ 36} In his fifth assignment of error, appellant argues the trial court erred by failing to give a curative instruction when the state's expert testified that "the law requires" certain information to be contained in a forensic report. Dr. Eshbaugh testified:

> It's just these things have to be documented in a forensic report, meaning in reasonable detail. That's what the law requires.

(Tr. Vol. IV at 547.)

{¶ 37} Appellant concedes he did not object to this testimony but argues the trial court should have sua sponte given a curative instruction. By failing to object, appellant has forfeited all but plain error. For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *Shine-Johnson* at 102, quoting *State v. Urbina*, 10th Dist. No. 15AP-978, 2016-Ohio-7009, ¶ 43, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 38} Although it is the trial judge's duty to instruct the jury on what the law requires, and therefore it is improper for a witness to opine regarding the same, we cannot say this rose to the level of plain error. First, we note the reference to what the law requires was a reference to the level of detail a forensic report requires. It was not an instruction regarding what the law requires in order to find appellant guilty of the charge. Furthermore, the jury instructions instructed the jurors that:

> The court and the jury have separate functions: you decide the disputed facts and the court provides the instructions of law. It is your sworn duty to accept these instructions and to apply the law as it is given to you. You are not permitted to change the law, or to apply your own conception of what you think the law should be.

(Jury Instructions at 1.)

{¶ 39} An appellate court presumes the jury follows the trial court's instructions. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 190. Therefore, we disagree that any error in this regard would have affected the outcome of the trial.

{¶ 40} Accordingly, we overrule appellant's fifth assignment of error.

## V. Third Assignment of Error

{¶ 41} In his third assignment of error, appellant argues the cumulative effect of errors, as delineated in his first and second assignments of error, plus any errors delineated in the third and fourth assignments of error, violated appellant's due process right to a fair trial. We disagree.

{¶ 42} " 'Pursuant to the doctrine of cumulative error, a judgment may be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though the errors individually do not rise to the level of prejudicial error.' " *Shine-Johnson* at ¶ 115, quoting *State v. McClurkin*, 10th Dist. No. 11AP-944, 2013-Ohio-1140, ¶ 61.

{¶ 43} First, the Supreme Court has determined the trial court did not err in instructing the jury that blackout was an affirmative defense. Second, although we found the prosecutor's statements that (1) the jury had to believe Dr. Reardon "beyond a reasonable doubt," and (2) Dr. Reardon did not consider a diagnosis of alcoholism were improper, we found that such statements did not prejudicially affect appellant's substantial rights nor result in denial of a fair trial to him. Third, although the trial court omitted the term "unconscious" when verbally instructing the jury, the term was properly included in the written jury instructions. Fourth, the jury was instructed that the judge provides the instructions of law and it is presumed that the jury followed these instructions.

{¶ 44} Accordingly, we overrule appellant's third assignment of error.

## VI. Conclusion

{¶ 45} On remand from the Supreme Court, pursuant to *Ireland II*, appellant's first assignment of error is overruled. Pursuant to our consideration on remand, appellant's

second, third, fourth, and fifth assignments of error are overruled.  Therefore, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

LUPER SCHUSTER, J., concurs.
BRUNNER, J., concurs in part and concurs in judgment.

Brunner, J., concurring in part and concurring in judgment.

{¶ 46}  I concur with the majority as to the first assignment of error and respectfully concur in judgment only as to the second, third, fourth, and fifth assignments of error, which we previously held moot but now have been instructed to consider on remand from the Supreme Court of Ohio in *State v. Ireland*, ___ Ohio St.3d ___, 2018-Ohio-4494 ("*Ireland II*").

{¶ 47}  The majority states in paragraph 29, "[a]ppellant did not testify, as he was not required to," and then states, "[t]herefore there is no direct evidence regarding what he was thinking when he departed the bar and did not return later with his wife."  Toward the end of paragraph 29, the majority then states that, "[t]he prosecutor argued the jury could infer appellant was conscious from the direct evidence that he departed the bar after 911 had been called and did not return with his wife later."

{¶ 48}  Even though the majority points out that direct and circumstantial evidence are of equal weight, the majority appears to infer that direct evidence is better than circumstantial evidence.  This is not the law and it presumes that direct evidence may be taken to be truthful, despite the fact that circumstantial evidence may at times be more reliable or permit more reliable inferences in determining the facts.

{¶ 49}  Additionally, the majority's consideration of direct versus circumstantial evidence is discussed in the context of Ireland's decision not to testify on his own behalf and face being compelled to testify against himself on cross-examination.  Whether or not he testified should not be even a scintilla of consideration or consequence in our appellate consideration of the conduct of the prosecutor and alleged errors as they would have affected his due process right to a fair trial.

{¶ 50}  I agree with the majority that the prosecutor can argue before the jury what the evidence means and what inferences should be drawn from it.  But it is not within our purview to review the fairness of Ireland's trial based on whether evidence was direct evidence in the form of testimony from the defendant, or direct or circumstantial evidence

in the form of testimony from others or physical exhibits concerning the incidents at the center of the indictments. Even if Ireland had testified, we cannot be certain of what he would have said, whether it would have been wholly truthful and whether a jury would have believed what he said. To use the character of evidence, based on whether it was direct or circumstantial evidence, in any analysis of whether or not the prosecutor engaged in misconduct or there existed cumulative errors, is both unnecessary and unwarranted and is not in keeping with constitutional safeguards, especially as to whether or not a defendant testified on his own behalf. Under these circumstances, engaging in "what if" or conjecture concerning an absolute constitutional right opens the door to its erosion.

{¶ 51} Because the majority may have effectively opened this door, I concur in judgment only with the majority's decision as to the second, third, fourth, and fifth assignments of error. As to the first assignment of error, in abiding by the mandate of the Supreme Court of Ohio, I concur with the majority as to Ireland's first assignment of error.

———————————