[Cite as *State v. Beall*, 2021-Ohio-1326.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO                                  :
                                              :
    Plaintiff-Appellee                     :     Appellate Case No. 28335
                                              :
v.                                            :     Trial Court Case No. 2018-CR-2084/1
                                              :
JOSHUA BEALL                                   :     (Criminal Appeal from
                                              :     Common Pleas Court)
    Defendant-Appellant                    :
                                              :

. . . . . . . . . . .

O P I N I O N

Rendered on the 16th day of April, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by SARAH E. HUTNIK, Atty. Reg. No. 0095900, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, 101 Southmoor Circle NW, Kettering, Ohio 45429
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, P.J.

{¶ 1} Defendant-appellant Joshua Beall appeals from his convictions for robbery, complicity to commit robbery, having weapons under disability, murder, attempted murder, felonious assault, failure to comply, and improper handling of firearms in a motor vehicle. For the reasons that follow, we affirm.

## I.     Facts and Procedural Background

{¶ 2} On May 26, 2018, a man entered the U.S. Bank facility located inside the Meijer store on Colonel Glenn Highway in Fairborn. The man's face was covered in a thick layer of makeup foundation, and he was wearing a turtleneck with sleeves to the wrist, a hoodie with a flower print, large sunglasses, and gloves. He approached Stephanie Burkhardt, a bank manager, who was working at a teller station. The man showed Burkhardt a piece of paper on which was written, "This is a robbery, do not call the police." Tr. p. 730. Burkhart placed approximately $2,500 dollars in the man's bag. The man then left the building.

{¶ 3} The following day, Christopher Benner was at work in the automotive department of a Walmart located on Brandt Pike in Huber Heights. He noted a vehicle pull up to the side of the garage bay doors. A man wearing a black t-shirt with the word "Thrasher" in white lettering exited the vehicle and opened the vehicle's hood. Benner noted the man had tattoos on his face, neck, arms, and legs. The man asked Benner if the car could be repaired at the Walmart facility. Benner informed him that the facility was not equipped to make the requested repair and did not sell the needed part. The man then entered the Walmart at approximately 1:00 p.m.; video surveillance cameras recorded him buying makeup foundation, eyeliner, concealer, applicator pads, and face

wipes.

{¶ 4} On that same day, Lindsey Hanson was working as a delivery driver for a Domino's Pizza restaurant. She was driving her own vehicle, a black Mazda sports utility vehicle (SUV). At approximately 5:00 p.m., Hanson was in her car making two deliveries; the second delivery was to a person who had placed an on-line order and identified himself as Jacob Wilkinson. The order form stated that the customer would be on a break from work and would be behind his workplace at the intersection of Taylorsville Road and Brandt Pike. When Hanson pulled behind the identified business, she observed a man sitting on a bench. The man had a "buzz" haircut, numerous tattoos, and was wearing a black t-shirt with the word "Thrasher" on the front. Tr. p. 916. Hanson exited her car with a large bottle of Sprite and a "heat bag" containing pizza. She approached the man, and he handed her cash. She handed him the soft drink, then placed one hand under the heat bag and began extracting the pizza with her other hand. The man pulled out a gun, held it to her face, and told her he was taking her car. After the man left in her car, Hanson ran to the front of the building and asked someone to call the police.[1]

{¶ 5} On May 29, 2018, Brandon Morgan was working at the Colonel Glenn Highway U.S. Bank branch that had been robbed on May 26. He was at a teller station when he observed a man enter the bank wearing thick makeup, a straw hat, big sunglasses, and a green coat with a high collar and long sleeves. Morgan, who was aware of the prior robbery and who had seen pictures of the robber, told a co-worker at

---

[1] Hanson identified Beall as the person who took her vehicle during a pre-trial photo array identification and an in-court identification.

the next teller station that they were "about to get robbed." Tr. p. 758. The man walked up to Morgan and handed him a pink Post-it note with lines on it, on which was written: "this is a robbery, give me all of your 50's, 20's and 100's, no dye packs." Tr. p. 758. As Morgan reached into his cash drawer, the man said "hurry the f*** up, this isn't a joke." Tr. p. 759. Morgan gave the man approximately $2,500 and returned the note to him. The suspect left the building and entered an SUV waiting outside.

{¶ 6} On May 30, 2018, Alexander Vasquez was working as a night auditor at a local hotel. He ended his shift at approximately 7:00 a.m., and he returned to his apartment. When he got home, Beall, Casey Cole, and Donald Armstrong were in his apartment. (Beall and Vasquez had a sexual relationship; Armstrong and Cole had been staying at Vasquez's apartment.) The three asked to borrow Vasquez's rental car, which was a black Mitsubishi Outlander SUV. The three left in his car, and Vasquez went to bed.

{¶ 7} At approximately 2:20 p.m. that same day, a woman, later identified as Cole, entered the LCNB Bank branch on Far Hills in Oakwood. Cole was wearing a reddish-colored shirt, jean shorts, tennis shoes, and large glasses. Cole handed a note to Jacqueline Ginn, who was working as a teller that day. The note stated that the bank was being robbed and requested various bill denominations; the note also stated that the bills should not be marked and a dye pack should not be used. Ginn gave Cole currency as demanded by the note. Cole then took the note back from Ginn, left the store, and walked to the adjacent CVS Pharmacy parking lot, where she entered a car and drove away.

{¶ 8} Later that day, Beall, Cole, and Armstrong returned to Vasquez's apartment

and went directly into a bedroom. Vasquez was sitting in the living room when he heard several gunshots from the bedroom. Beall walked out of the bedroom and looked out the window of the apartment. Beall then returned to the bedroom, and Vasquez heard two more gunshots. Beall again walked out of the bedroom, then pointed a gun at Vasquez. Beall attempted to pull the trigger, but the gun did not fire. Beall ran out of the apartment, and Cole followed Beall out of the apartment. Vasquez found Armstrong, who had been shot, on the floor in the bedroom. Armstrong died from multiple gunshot wounds.

{¶ 9} Oakwood police investigators received a tip that the woman involved in the LCNB robbery was Casey Cole. After obtaining a photograph of Cole from a state database, police recognized her as the suspect caught on the bank's surveillance system. Surveillance camera footage from the CVS beside the bank showed Cole getting into a black Mitsubishi SUV. Oakwood police ascertained that the Mitsubishi had been rented by Alexander Vasquez. A picture from the LCNB footage was shown to Vasquez by Oakwood Detective Jeff Yount, and Vasquez identified the woman in the picture as Cole. The police searched the Mitsubishi and found makeup foundation smeared on the exterior. They also found makeup in a Walmart bag inside the vehicle. A search of Vasquez's apartment revealed a pad of lined pink Post-it notes and seven shirts with makeup on their collars. Police also found a green long-sleeved coat with an emblem, which matched the description of the coat worn by the perpetrator of the second U.S. Bank robbery; the coat had makeup on its collar. A crumpled piece of pink paper was also recovered. The paper appeared to have been wet at one point, but it appeared to still have the word "robbery" written on it.

{¶ 10} Cole's cellphone was used to track her to Sharonville, Ohio. Sharonville police found a black Mazda SUV in the parking lot of an Enterprise Rental Car facility. An officer observed that the car was occupied and approached the vehicle with his gun drawn. The Mazda drove off through the grass, and officers pursued. During the chase, the car drove at high speeds and traveled the wrong way on different roads with its lights off. The car eventually wrecked when a road it had been traveling on suddenly ended. When officers approached the car, it was flipped onto its top and the airbags were deployed. Beall was removed from the car and transported to a local hospital. While en route to the hospital, an emergency medical technician (EMT) sat in the back of the ambulance with Beall. The EMT was filling out paperwork when Beall said that he had "always wanted to kill somebody but it just didn't feel as good as he thought it would." Tr. p. 59.

{¶ 11} Dayton police retrieved evidence the Sharonville police had found in the wrecked vehicle, including wigs, guns, ammunition, Armstrong's wallet, cash, and Lindsey Hanson's identification. When Dayton police interviewed Beall, he admitted he had committed the U.S. Bank robberies. He also stated he made Cole rob the LCNB Bank, and that he and Armstrong were with Cole when she committed the robbery. He further admitted the trio was counting money from the LCNB robbery when he shot Armstrong; afterward, Beall went into the living room with the intent to shoot Vasquez, but Beall left the apartment when his gun jammed. Finally, Beall admitted that he had robbed Hanson and stolen her car, and that he was in Hanson's car when he was apprehended after the car chase.

{¶ 12} On June 8, 2018, Beall was indicted on two counts of robbery (use/threat of

force) in violation of R.C. 2911.02(A)(3), one count of having weapons under disability (prior offense of violence) in violation of R.C. 2923.13(A)(2), one count of having weapons under disability (prior drug offense) in violation of R.C. 2923.13(A)(3), one count of robbery (physical harm) in violation of R.C. 2911.02(A)(2), one count of complicity to commit robbery (use/threat of force) in violation of R.C. 2923.03(A)(2) and 2911.02(A)(3), two counts of murder (proximate result) in violation of R.C. 2903.02(B), one count of attempted murder in violation of 2923.02(A), one count of felonious assault (serious physical harm) in violation of R.C. 2903.11(A)(1), one count of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2), one count of failure to comply (serious physical harm/substantial risk) in violation of R.C. 2921.331(B) and (C)(5)(a)(ii), and one count of improper handling of a firearm in a motor vehicle (loaded/no license) in violation of R.C. 2923.16(B). The counts for murder, attempted murder, and felonious assault carried attendant firearm specifications.

{¶ 13} A bench trial was conducted on the two counts of robbery (use/threat of force) involving U.S. Bank and the two counts of having a weapon under disability. The trial court found Beall guilty of all four charges. Thereafter, a jury trial was conducted on the remaining charges.

{¶ 14} In addition to the above-cited evidence which was adduced at trial, the State presented the testimony of Julia Vigo, who was Beall's girlfriend at the time of the offenses. She testified that, when she came home on May 26, 2018, she found Beall with money, and he told her he had robbed a bank at Meijer. Vigo further testified that she went to Vasquez's apartment on May 30, 2018, the morning of the LCNB robbery, in order to see Beall. She testified that she and Beall had sex and that he asked her if she

"wanted him to kill them all." Tr. p. 1617. Vigo testified Beall was referring to Armstrong, Cole, and Vasquez and that he deemed them all to be "loose ends" who might talk. Tr. p. 1618. Afterward, Vigo returned to her own apartment.

{¶ 15} Vigo testified that she and Beall engaged in a video telephone call around 11:00 a.m. that same morning during which Beall told her that he, Cole, and Armstrong were going to rob a bank. Beall was in a vehicle, and Vigo could hear Cole and Armstrong talking. Around 4:00 p.m., Vigo texted Beall to check on him. He texted her back and indicated that he and Armstrong had made Cole rob a bank.

{¶ 16} Vigo and Beall had another video call, at which time Beall was in Vasquez's bedroom. Beall asked Vigo if she wanted to "see someone die today." Tr. p. 1628. Vigo testified that Beall then hung up. Vigo went over to Vasquez's apartment, where she learned Armstrong had been shot.

{¶ 17} Vigo testified that she returned to her apartment and found a note from Beall in which he claimed his life was over. Vigo testified that the correspondence from Beall contained statements saying that he had "two angles on the murder" and that he would either claim self-defense or blame it on Cole. Tr. p. 1644. Vigo also testified that other correspondence from Beall stated, "I haven't seen the evidence and I already confessed, but I can say I was lying because I was in love with Casey [Cole], trying to protect her and get my confession thrown out." Tr. p. 1644. Another letter from Beall stated:

> Tell Alex I'm putting it on Casey. When my trial comes take a vacation, get
> a cheap hotel for a few days and don't show up to trial. [Alex] won't be
> breaking any laws and won't be in any trouble whatsoever. * * * Google it
> if you don't believe me. His testimony * * * will kill me literally. If either of

you even care I'll tell you more later * * *if we're still talking. I do need your help on this. I have a plan, a half-baked one, but a plan nonetheless."

Tr. p. 1641.

{¶ 18} Finally, Vigo testified that Beall sent her a letter with advice on robbing banks.

{¶ 19} Beall testified on his own behalf. He admitted to aiming a gun at Hanson and taking her car, but he stated that the gun was a BB gun. He also admitted he was with Cole and Armstrong during the LCNB robbery and received $400 as his share to the stolen money. Beall testified that the group stopped and bought heroin for Armstrong and that he also bought a gun for Armstrong. They smoked marijuana and then went to Vasquez's apartment. Beall claimed Armstrong was acting strange and that Armstrong and Cole were whispering to each other. Beall claimed Armstrong reached for his new gun, which he had in the back of his waistband, at which time Beall shot him. Beall admitted pointing his own gun at Vasquez but denied trying to pull the trigger.

{¶ 20} The jury found Beall guilty as charged. After merging some offenses, the trial court sentence Beall to a prison sentence of 56.5 years to life. Beall appeals.

## II.     Sufficiency and Manifest Weight of the Evidence

{¶ 21} Beall's first assignment of error states as follows:

THE GUILTY VERDICTS ON THE BANK ROBBERY COUNTS AND ON THE ATTEMPTED MURDER COUNT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, AND THE EVIDENCE PRESENTED WAS INSUFFICIENT, AS A MATTER OF LAW, TO PROVE THE APPELLANT'S

GUILT BEYOND A REASONABLE DOUBT.

{¶ 22} Beall asserts the State failed to present evidence sufficient to prove the offenses of robbery and attempted murder and that these convictions were against the manifest weight of the evidence.

{¶ 23} A sufficiency of the evidence analysis focuses upon whether the prosecution presented adequate evidence to sustain the verdict, viewing such evidence in the light most favorable to the prosecution. *State v. Radford*, 2d Dist. Clark No. 2016-CA-80, 2017-Ohio-8189, ¶ 14. The prosecution has presented sufficient evidence when "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d (1991), paragraph two of the syllabus.

{¶ 24} A manifest weight analysis, in contrast, requires an appellate court to review the record, weigh the evidence and any reasonable inferences allowed by the evidence, consider witness credibility, and determine whether the trier of fact, in resolving any evidentiary conflicts, "clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* at ¶ 15. This consideration of the evidence must be exercised with caution so that a new trial will only be granted "in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Though different legal concepts are involved, if a verdict is supported by the manifest weight of the evidence, the evidence, by necessity, is legally sufficient. *Id.* at ¶ 16.

{¶ 25} When evaluating arguments regarding the manifest weight of the evidence, it is important to note that, "[b]ecause the factfinder * * * has the opportunity to see and

hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997).

{¶ 26} We turn first to Beall's claim that the State failed to present evidence to support the attempted murder conviction. Beall asserts that Vasquez's trial testimony, during which he claimed Beall pointed the gun at him *and* pulled the trigger, was not credible because he never informed investigators that Beall had actually tried to pull the trigger. He further argues that, even if Vasquez's testimony were believed, it "was simply insufficient to convince the average mind of the defendant's guilt beyond a reasonable doubt."

{¶ 27} In order to prove attempted murder, as proscribed by R.C. 2903.02(A) and R.C. 2923.02(A), the State must demonstrate, beyond a reasonable doubt, that Beall purposely engaged in conduct which, if successful, would have caused Vasquez's death. A person acts purposely when it is his specific intention to cause a certain result. R.C. 2901.22(A). Intent to kill "may be presumed where the natural and probable consequence of a wrongful act is to produce death" and "may be deduced from all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound." *State v. Robinson*, 161 Ohio St. 213, 118 N.E.2d 517 (1954), paragraph five of the syllabus. "The specific intent to kill may be reasonably inferred from the fact that a

firearm is an inherently dangerous instrument, the use of which is likely to produce death." (Citation omitted.) *State v. Searles*, 8th Dist. Cuyahoga No. 96549, 2011-Ohio-6275, ¶ 11.

**{¶ 28}** Here, Vasquez testified that, after he heard two separate rounds of gunfire from the bedroom, he observed Beall exit the bedroom a second time, turn toward him (Vasquez), and point the gun at him, at which time Vasquez said, "[p]lease don't shoot, don't shoot, whatever you do just please don't shoot." Tr. p. 1046. Vasquez testified he then observed Beall "trying to pull that trigger like and trying to shoot me, and I had to keep my eyes on that gun to see if it was going to shoot." *Id.* According to Vasquez's testimony, Beall attempted to pull the trigger more than once and fled the apartment when the gun failed to fire.

**{¶ 29}** During cross-examination, defense counsel noted that while Vazquez had told investigators Beall pointed the gun at him, he did not inform them that Beall had tried to pull the trigger. Vasquez indicated he would be surprised if he had not told the police that Vasquez tried to pull the trigger, but Vasquez further stated that he was in "shock" at the time he was interviewed

**{¶ 30}** The jury observed Vasquez during his testimony and was made aware that he did not mention to investigators that Beall attempted to pull the trigger when aiming the gun at Vasquez. "In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness * * * and to draw reasonable inferences from the evidence presented." *State v. Dewberry*, 2d Dist. Montgomery No. 27434, 2020-Ohio-691, ¶ 44. Vasquez's testimony was sufficient to permit the jury to convict Beall of attempted murder. Further, based upon our review of the record, we cannot conclude the jury lost its way in

deciding to believe Vasquez's testimony. However, even were we to accept Beall's argument on this issue, we note that the jury was also shown the videotape of Beall's custodial interview in which he admitted he had intended to shoot Vasquez and would have done so but for the fact that his gun did not fire. Thus, we find this argument lacks merit.

{¶ 31} We next address the robbery convictions. The specific issue Beall raises is whether, as to each bank robbery conviction, the force element was established by sufficient evidence and supported by the weight of the evidence.

{¶ 32} The offense of robbery is proscribed by R.C. 2911.02, which provides: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [u]se or threaten the immediate use of force against another." R.C. 2911.05(A)(3). " 'Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1)

{¶ 33} In *State v. Davis*, 6 Ohio St.3d 91, 451 N.E.2d 772 (1983), the Ohio Supreme Court held:

> [C]urrent R.C. 2911.02(A) defines the crime of robbery as the use or threat of immediate use of force against another. This requirement is satisfied if the fear of the alleged victim was of such a nature as in reason and common experience is likely to induce a person to part with property against his will and temporarily suspend his power to exercise his will by virtue of the influence of the terror impressed.

*Id.* at 94.

{¶ 34} In construing *Davis*, we have stated that the issue is whether "the actions

of the defendant, objectively viewed, are such as can be reasonably expected to create a fear in the victim sufficient to cause the victim to part with property against his or her will." *State v. Adkins*, 2d Dist. Clark No. 2895, 1992 WL 180142, *2 (Jul. 20, 1992). In *Adkins*, a man placed a note on a bank teller's counter that said, "Hi. This is a robbery. Put $5,000 in a bag and don't push no buttons." *Id.* at *1. The man said it was not a joke and repeated that no buttons should be pushed. *Id.* When the teller said she did not know what to do, the man repeated, "Give me $5,000." *Id.*

{¶ 35} In addressing whether Adkins threatened the immediate use of force, we stated that the note, "without more," would not necessarily constitute a threat of immediate force * * * [but] the note [had to] be considered in its entirety * * * together with the rest of the evidence in the case." *Id.* at *2. In concluding that the evidence was sufficient to establish the immediate use of force, we emphasized that the note instructed the teller "not to push any button," and that the teller was trained to take a "robbery note seriously because [as stated by the teller] 'they might have a weapon, because you never know what they'll do.' " *Id.*[2] We further stated that the use of the word "robbery" in the note implied violence." *Id.*, citing *Webster's Third International Dictionary* (1966), p. 1964. We concluded that, "[o]n balance, * * * the evidence * * * was sufficient to establish beyond a reasonable doubt that [the teller] was in fear, that the fear was reasonable * * *, and that the fear was sufficient to cause [the teller] to part with money that she did not want to part with." *Id.* at *4.

---

[2] Written or verbal demands for money to a bank teller are common means used to rob a bank and "carry with them an implicit threat: if money is not produced, harm to the teller or other bank employee may result." *United States v. Gilmore*, 282 F.3d 398, 402 (C.A.6, 2002).

{¶ 36} In Beall's case, in each bank robbery, a note was used which announced that a robbery was taking place.   In the first U.S. Bank robbery, the note included the instruction "not to call the police."   Burkhardt, the teller Beall confronted, testified that she perceived the note as a threat, and she felt compelled to give money to Beall as demanded.   In the second U.S. Bank robbery, Beall ordered another teller, Morgan, to "hurry the f*** up, this isn't a joke."   Morgan testified he felt threatened by Beall's conduct. During the LCNB robbery, the note used by Cole included the instruction that the bills should not be marked and that a dye pack should not be used; Ginn, the teller, testified that she was concerned Cole may have had a gun.   In each robbery, the note, along with the respective instruction ("not to call the police," "hurry the f*** up, this is not a joke," and not to provide marked bills or use a dye pack) included a threat, albeit an implicit one, that unless there was compliance, harm to the involved teller or another bank employee may have occurred.   Thus, with respect to each robbery, we conclude the evidence was sufficient to allow a reasonable juror to find beyond a reasonable doubt that each teller was in fear of the immediate use of force, that such fear was reasonable, and that the fear caused each teller to part with money that the teller would not have otherwise parted with.   We further conclude, based upon our evaluation of the evidence, that as to each bank robbery, the jury's conclusion as to the force element was not against the manifest weight of the evidence.

{¶ 37} The first assignment of error is overruled.

### III.    Motion to Sever Counts

{¶ 38} Beall's second assignment of error is as follows:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT OVERRULED APPELLANT'S MOTION FOR MISJOINDER OR TO SEVER COUNTS.

{¶ 39} Beall asserts that the trial court should have granted his motion to sever the murder and felonious assault counts from the two U.S. Bank robbery counts. He contends the offenses were not related. He further claims that he testified in order to establish that he acted in self-defense in shooting Armstrong, and that his credibility was "undoubtedly impacted negatively by the evidence of undisputed actions that gave rise to the U.S. Bank charges."

{¶ 40} A criminal defendant may seek severance of multiple charges under Crim.R. 14, which provides that "[i]f it appears that a defendant or the state is prejudiced by a joinder of offenses * * * the court shall order an election or separate trials of counts, grant a severance of defendants, or provide such other relief as justice requires."

{¶ 41} In *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), the Ohio Supreme Court stated:

A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial.

*Id.* at syllabus.

{¶ 42} Here, the trial court denied the motion to sever. Even were we to find this

constituted error, we would be constrained to determine it was harmless. The record reflects that the U.S. Bank robbery counts were separately tried to the bench rather than to the jury. The practical effect of having separate trials was essentially to sever the U.S. Bank charges from the murder and felonious assault charges.

{¶ 43} The second assignment of error is overruled.


### IV. Other-Acts Evidence

{¶ 44} The third assignment of error asserted by Beall states as follows:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ALLOWED THE GOVERNMENT TO PRESENT EVIDENCE OF OTHER CRIMES, WRONGS OR ACTS UNDER EVIDENCE RULE 404(B).

{¶ 45} Beall claims the trial court erred by allowing the introduction of improper other-acts evidence.

{¶ 46} Evidence of other acts "is not generally admissible to demonstrate that the defendant has a propensity for crime or that his character is in conformity with the other acts." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 26, quoting *State v. Mann*, 19 Ohio St.3d 34, 482 N.E.2d 592 (1985), paragraph one of the syllabus. This common law admissibility rule is based upon the common sense notion that the "typical juror" will be influenced by evidence that the defendant committed other crimes or bad acts. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 20. However, Evid.R. 404(B) allows the admission of other-acts evidence if such evidence is admitted for a relevant purpose unrelated to the defendant's propensity to commit bad acts, and if the probative value of the evidence "is [not] substantially

outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." *Id.* at ¶ 22, citing Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, Section 4.10 (2d Ed.2019); *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 17.

{¶ 47} Beall asserts that the trial court erred by admitting the following other-acts evidence during the jury trial: evidence of Beall's commission of the two U.S. Bank robberies; evidence that Beall aided Armstrong in Armstrong's commission of three bank robberies committed outside Montgomery County, with such aid including providing Armstrong with a gun to use in the commission of the robberies; and, finally, evidence that Beall wrote Vigo a note which outlined how to rob a bank.

{¶ 48} We conclude the trial court did not err by allowing admission of the other-acts evidence. Turning first to the bank robberies Armstrong committed outside of Montgomery County, it was the State's theory that Beall murdered Armstrong because Beall considered him to be a "loose end" who might talk to the police, a theory given credence by Vigo's testimony. Armstrong's participation in the crime spree orchestrated by Beall, which, of course, included the three other bank robberies, was the reason Armstrong was a "loose end." We conclude the evidence setting forth Beall's assistance to Armstrong constituted relevant other-acts evidence regarding Beall's motive for Armstrong's murder. We further conclude the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury.

{¶ 49} Secondly, we conclude that the trial court did not err by allowing testimony regarding Beall's note to Vigo outlining how to rob a bank. The note's content was

consistent with Cole's actions during the Oakwood LCNB robbery. Thus, the testimony regarding the note was relevant to the State's theory that Beall orchestrated the LCNB robbery. We also conclude that the probative value of this evidence was not substantially outweighed by the prospect of unfair prejudice, confusion, or misleading the jury.

{¶ 50} Finally, we conclude the trial court did not err by allowing the evidence setting forth how Beall committed the U.S. Bank robberies. The U.S. Bank robberies were committed in a strikingly similar fashion to the LCNB robbery. The similarities included the use of heavy makeup, wearing distinctive clothing and large glasses, and the use of a note (containing instructions) to announce the robbery. When there is a distinct similarity (a modus operandi) between how a defendant committed a previous crime and how the charged crime was committed, evidence concerning how the previous crime was committed may be admissible in the trial of the charged offense. *State v. Lowe*, 69 Ohio St.3d 527, 531, 634 N.E.2d 616 (1994). In such a case, the other-acts evidence is admissible "because it provides a behavioral fingerprint which, when compared to the behavioral fingerprint[ ] associated with the crime in question, can be used to identify the defendant as the perpetrator." *Id.* In this case, though Beall committed the U.S. Bank robberies and Cole committed the LCNB robbery, the similarity (the behavioral fingerprint) between the crimes was such that the trial court appropriately allowed the other-acts evidence to establish Beall's planning and other aiding and abetting involvement in the LCNB robbery.[3]

---

[3] If we had arrived at a contrary conclusion regarding any of the other-acts evidence, the outcome would not have changed. A trial court's improper admission of other-acts evidence "may be deemed harmless error * * * when, after the tainted evidence is

{¶ 51} Accordingly, we overrule the third assignment of error.

### IV.  Trial Court's Discussion with Defense Witness

{¶ 52} The fourth assignment of error provides as follows:

THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN ITS STATEMENT TO A DEFENSE WITNESS THAT CAUSED THE WITNESS TO DECLINE TO TESTIFY, THUS DEPRIVING APPELLANT OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW.

{¶ 53} Beall claims that the trial court improperly admonished a defense witness, Casey Cole, regarding her Fifth Amendment rights, causing her to decline to provide testimony, and thus denying him his due process right to present witnesses.

{¶ 54} The Supreme Court of the United States has expressly recognized that a defendant's right to present his own witnesses in order to establish a defense is a fundamental element of due process.  *United States v. Foster*, 128 F.3d 949, 953 (6th Cir.1997), citing *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).  However, "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him compulsory process for obtaining witnesses in his favor."  *State v. Abdelhaq*, 8th Dist. Cuyahoga No. 74534, 1999 WL 1067924, *4 (Nov. 24, 1999).

{¶ 55} In contrast, "[t]he Fifth Amendment privilege against self-incrimination

---

removed, the remaining evidence is overwhelming."  *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 32.  Upon exclusion of the other-acts evidence, the State's evidence, which included Beall's confession, was overwhelming as to each count decided by the jury.  Thus, even assuming the trial court's other-acts decisions were erroneous, these errors were harmless beyond a reasonable doubt.

protects a witness from answering a question which might incriminate him if it is determined in the sound discretion of the trial court that there is a reasonable basis for the witness [to] apprehend that a direct answer would incriminate him." *State v. Cummings*, 5th Dist. Knox Nos. 89-CA-45 and 89-CA-46, 1990 WL 187117, *2 (Nov. 5, 1990), citing *Mason v. United States*, 244 U.S. 362, 37 S.Ct. 621, 61 L.Ed. 1198 (1917). In this vein, "[c]ourts have recognized that it is within the sound discretion of the court to warn a witness about the possibility of incriminating herself * * * so long as the court does not abuse that discretion by so actively encouraging a witness' silence that [the] advice becomes intimidation." *State v. Urbina*, 2016-Ohio-7009, 72 N.E.3d 105, ¶ 34 (10th Dist.), quoting *State v. Hamilton*, 10th Dist. Franklin No. 10AP-543, 2011-Ohio-3305, ¶ 42. *Accord United States v. Silverstein*, 732 F.2d 1338, 1344 (C.A.7, 1984); *Abdelhaq* at *5, citing *United States v. Arthur*, 949 F.2d 211, 216 (C.A.6, 1991).

**{¶ 56}** Beall asserts that the trial court's statements to Cole constituted undue intimidation. In support, he cites *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972), wherein the trial court gave a defense witness the following admonishment:

Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood (sic) is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going

to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

*Id.* at 95-96.

{¶ 57} On appeal, the United States Supreme Court stated:

But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole. At least some of these threats may have been beyond the power of this judge to carry out. Yet, in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify.

*Id.* at 97-98.

{¶ 58} In this case, when Beall indicated his intent to call Cole as a defense witness, the trial court engaged in the following colloquy with Cole outside the presence of the jury:

THE COURT: I appointed you Ms. Connelly to talk to you about your rights. Okay? Now, you were subpoenaed by the defendant and that's why you're here. In addition to the one count that you pled guilty to, you could still be charged with other counts in this case. You could be – there's something called complicity, aiding and abetting, helping someone. Do you understand what I'm talking about?

MS. COLE: Um-hum.

THE COURT: So you could be charged with aiding and abetting in murder and felonious assault. Any other charges that the defendant faces. If you want to testify, that's fine, but I want you to understand you could be prosecuted for any testimony you give on those issues that can incriminate you. Okay? You could also be indicted if it's found that you lied. All right? Or you could take the Fifth Amendment.

Now, if you want to take the Fifth Amendment, you can't do that in front of the jury, so if you decide to testify, you're sworn in and you have to answer the questions. But if you want to take the Fifth Amendment, then you won't come back and you won't be sworn in in this case. You talked to Ms. Connelly; I don't know if you want to talk to her anymore.

MS. COLE: Okay. I'm good.

THE COURT: What do you want to do?

MS. COLE:   I want to plead the Fifth.

THE COURT:   You want to take the Fifth Amendment?

MS. COLE:   Um-hum.

THE COURT:   That means you do not want to testify in this case.

MS. COLE:   I don't.

THE COURT:   Okay.

Tr. p. 1838-1839.

{¶ 59} As previously noted, Beall confessed before and during trial to the crimes. We note Beall did not make a proffer regarding what he believed Cole's testimony would have been, nor did he contend Cole would have provided any exculpatory evidence.

{¶ 60} Further, from our reading of this exchange, it does not appear that the trial court was attempting to intimidate Cole, but instead was merely ensuring she understood the possible consequences of her testimony, including possible perjury charges or other criminal charges related to admissions she might make while testifying.  Thus, we conclude the trial court did not abuse its discretion in admonishing Cole.

{¶ 61} The fourth assignment of error is overruled.


## V.    Conclusion

{¶ 62} All of Beall's assignments of error being overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and HALL, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Sarah E. Hutnik
Jeffrey T. Gramza
Hon. Susan D. Solle